RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0355p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DENNIS B. MCGUIRE,

       *Petitioner-Appellant,*

    v.

WARDEN, CHILLICOTHE CORRECTIONAL
INSTITUTION,

       *Respondent-Appellee.*

No. 13-3368

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 99-00140—Susan J. Dlott, Chief District Judge.

Argued: December 16, 2013

Decided and Filed: December 30, 2013

Before: SILER, ROGERS, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Allen L. Bohnert, FEDERAL PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Seth P. Kestner, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Gary W. Crim, Dayton, Ohio, Robert K. Lowe, Kelle Hinderer Andrews, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Seth P. Kestner, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

ROGERS, Circuit Judge. Dennis B. McGuire, an Ohio death row inmate represented by counsel, appeals from a federal district court order denying his motion for relief from judgment filed pursuant to Federal Rule of Civil Procedure 60(b). In

March 2008, the district court denied McGuire's original petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. This court affirmed the district court's denial, *see McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010), which became final when the Supreme Court denied a writ of certiorari in April 2011, 131 S. Ct. 2103 (2011). In his Rule 60(b) motion, McGuire sought to re-open a claim asserting the ineffectiveness of trial counsel arising from their failure to adequately investigate and present mitigation evidence at the penalty phase of trial, relying upon *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). McGuire argues that the procedural default for this claim should be excused because his counsel on state post-conviction review was ineffective. For the reasons that follow, McGuire has not demonstrated the extraordinary circumstances required to justify relief from final judgment pursuant to Rule 60(b)(6).

I.

The basic details of McGuire's trial, conviction, and sentence for the kidnapping, rape, and aggravated murder of Joy Stewart can be found in our previous opinion. 619 F.3d at 625–27. For the purposes of this appeal, which involves only the issue of the effectiveness of McGuire's penalty phase counsel in investigating and presenting mitigation evidence, we need only describe what that counsel actually presented during sentencing and how counsel's effectiveness in that regard was challenged during direct appeal and collateral review.

On direct appeal, the Ohio Supreme Court summarized the evidence presented in mitigation as part of that court's determination that the aggravating factors carried sufficient weight to support McGuire's capital sentence:

> Apart from inappropriately relying on residual doubt, appellant presented a number of other factors offered in mitigation. Doris Newton, McGuire's mother, and Tonya Cross, his half-sister, testified about McGuire's turbulent childhood. The defendant was born in 1960. His parents divorced two years later, leaving McGuire in the sole care of his mother. McGuire's father took his older brother away, and McGuire had little contact with them after that, except when he would run away from home to see them.

McGuire lived with his mother until he was eighteen. During that time, his mother was involved with several men, some of who[m] physically beat her in front of the appellant, who was required on occasion to run for help. His mother and half-sister testified that these men did not abuse the appellant physically; however, they did inflict mental abuse by calling McGuire names, yelling at him, and generally treating him poorly. Some of these men, however, were good to the defendant, and one continued to be available to help him even after the marriage with appellant's mother ended.

Defendant was also moved frequently, attending various schools, but eventually dropping out after ninth grade. Defendant began using marijuana at the age of nine and continued doing so until his incarceration in 1990. While imprisoned, appellant has taken strides to improve his education. He has also committed only minor infractions while incarcerated.

Appellant has not demonstrated that the factors listed as mitigation outweigh the aggravated nature of the murder. While appellant's mitigation evidence is entitled to some weight, it is insufficient to overcome the aggravating circumstance in this case, that defendant committed rape in conjunction with murder. We therefore conclude under our independent review that the aggravating circumstances outweigh the mitigating factors in this case.

*State v. McGuire*, 686 N.E.2d 1112, 1123 (Ohio 1997).

After McGuire was sentenced to death, he appealed to the Ohio Court of Appeals, although his appellate counsel, which had not represented him at trial or at sentencing, did not raise a claim of ineffective assistance of trial counsel. *See State v. McGuire*, No. CA95-01-001, 1996 WL 174609 (Ohio Ct. App. Apr. 15, 1996). That court affirmed the sentence of death. *Id.* at \*14.

McGuire appealed to the Ohio Supreme Court. *McGuire*, 686 N.E.2d at 1112. His counsel at this stage, yet again different from both his trial counsel and intermediate appellate counsel, did raise a claim of ineffective assistance of penalty phase counsel for failure to investigate and present mitigation evidence, as Proposition of Law Seven. *See id.* at 1125. However, because the trial-level ineffectiveness claim had not been raised at the intermediate appellate level, the supreme court deemed it forfeited. *See id.* at 1117. Still, a substantive mitigation-IAC claim was also nested within a claim of

ineffective assistance of appellate counsel, as a claim of ineffective assistance of intermediate-appellate counsel for failure to raise the mitigation-IAC claim. *See id.* at 1120. The state supreme court held that appellate counsel was not ineffective for failing to raise the mitigation-IAC claim:

> McGuire also claims that appellate counsel were ineffective for not raising a number of alleged penalty-phase errors made by trial counsel. First, he claims "inadequate preparation and presentation of mitigation evidence," because counsel should have hired a "mitigation specialist" to gather mitigating evidence. However, he cites no authority that this is a requirement of effective assistance, and we hold that it is not. He further complains that trial counsel should have called more [than] just the two members of McGuire's family to testify in the penalty phase. But the record does not show that this resulted from inadequate investigation or incompetent decisionmaking. In addition, McGuire claims that Dr. Kuehnl, the defense psychologist who testified on his behalf, was inadequately prepared and should have performed routine tests to determine whether McGuire was suffering a mental disorder. McGuire appears to blame defense counsel for this, but the record provides no basis to do so. Kuehnl may have decided that such tests were unnecessary. If so, it seems reasonable that counsel would defer to the psychologist's professional judgment. Given the difficulty of proving ineffective assistance of trial counsel and the weakness of appellant's claims, McGuire's appellate counsel were not deficient in failing to raise the issue of ineffective trial counsel.

*Id.* The court ultimately affirmed McGuire's convictions and sentence of death. *Id.* at 1124.

McGuire filed a petition for post-conviction relief, which the trial court denied without an evidentiary hearing. In dismissing McGuire's claim, the trial court emphasized the failure of post-conviction counsel to attach documentary evidence outside the record to support his claim:

> Petitioner claims that his counsel failed to properly prepare for the penalty phase.

As stated by the State in its response to this claim, Petitioner has failed to offer any documentary evidence to support the claimed failure to prepare.

On pages 31 through 33, Petitioner offers a mini-seminar relative to the proper manner in which to obtain and present mitigation evidence. On pages 34 and 35 Petitioner attempts to specifically set forth defense counsel's alleged failure. A review of the allegations reveals that for the most part Petitioner complains that the information presented fell short of that which was necessary to support the sentence preferred by Petitioner, i.e. life imprisonment. The claim is result oriented, i.e. because the jury recommended a sentence of death trial counsel must have been ineffective in their representation. Petitioner ignores the possibility that there was no additional mitigating evidence to present.

The record reveals that defense counsel acted professionally and effectively throughout the entire trial including the mitigation phase. If there is evidence outside the record to support a claim that defense counsel failed to properly prepare for the mitigation phase then same should have been attached to the Petition.

McGuire appealed the post-conviction trial court's decision, but did not challenge the trial court's ruling with respect to the mitigation-IAC claim. The Ohio Court of Appeals affirmed the denial of the petition. *State v. McGuire*, No. CA97-06-015, 1998 WL 191415, at *8 (Ohio Ct. App. Apr. 20, 1998). The Supreme Court of Ohio declined further review. *State v. McGuire*, 699 N.E.2d 945 (Ohio 1998).

McGuire filed a second post-conviction petition with the state trial court, raising only the mitigation-IAC claim. This time, McGuire supported the petition with six exhibits. The trial court denied McGuire's second petition for post-conviction relief. The court of appeals affirmed, stating that the mitigation-IAC claim was barred by res judicata:

Petitioner first argues that his claims cannot logically be barred by *res judicata* because his claims have not been fully litigated. Petitioner's claims could have been fully litigated, but petitioner failed to present adequate evidence to support those claims. Petitioner's second petition merely offers additional evidence with respect to issues previously addressed by the first petition.

In his first postconviction petition, petitioner alleged the ineffective assistance of his counsel during the death penalty phase of the

proceedings. In Cause of Action X, petitioner claimed his attorneys had failed to adequately investigate and present mitigation evidence to the jury in the form of family member testimony, expert mitigation testimony, and psychiatric testimony. Ruling on his postconviction petition, the trial court determined that petitioner had failed to offer any documentary evidence to support his claims and that the record showed trial counsel had acted effectively in the mitigation phase of the proceedings.

In his second postconviction petition, petitioner made precisely the same argument but attempted to introduce additional evidence. Petitioner offered documents in the form of additional affidavits from family members regarding his formative years. The trial court found petitioner's claim of ineffective assistance barred because he had raised precisely the same claim in his first postconviction petition.

The operative facts in this case are very similar to those in [*State v. Castro*, 425 N.E.2d 907, 909 (Ohio Ct. App. 1979)]. There, the petitioner alleged ineffective assistance of counsel in a second postconviction petition. *Id.* The petitioner had alleged the ineffective assistance of counsel in his first postconviction petition. *Id.* The court found the second petition's claim barred by *res judicata*. *Id.* We reach the same result.

Petitioner's ineffective assistance claim was raised in his first postconviction petition. Petitioner failed to provide necessary affidavits to fully litigate the issue. *Res judicata* therefore bars his subsequent claim. Although petitioner attempts to differentiate his claims from the claims raised in [*State v. Perry*, 226 N.E.2d 104 (Ohio 1967)], he has offered no valid reason that *res judicata* should not apply to bar this claim, and it is not necessary to address the issue on its merits. Accordingly, the trial court's ruling is affirmed. Petitioner's second assignment of error is overruled.

*State v. McGuire*, No. CA2000-10-011, 2001 WL 409424, at *10 (Ohio Ct. App. Apr. 23, 2001). The Ohio Supreme declined further review. *State v. McGuire*, 754 N.E.2d 259 (Ohio 2001).

McGuire filed a petition for a writ of habeas corpus in the federal district court for the Southern District of Ohio. In his second ground for relief, McGuire argued that his penalty phase counsel deprived him of the effective assistance of counsel by inadequate preparation and presentation of mitigation evidence. The case was referred to a magistrate judge, who, without conducting an evidentiary hearing, issued a report

recommending that McGuire's petition be denied. The magistrate judge determined that the ineffectiveness claim was procedurally defaulted, stating:

> First, Ohio has a *res judicata* rule which essentially required Mr. McGuire to raise this ineffective assistance of counsel claim in his direct appeal. Second, the Ohio Supreme Court specifically found that Mr. McGuire had waived the issue. Third, the Sixth Circuit has determined that Ohio's *res judicata* rule is an "adequate and independent" state ground for purposes of a procedural default analysis.

McGuire abandoned the claim in his objections to the report and recommendation. *See* R. 94 at 8 ("We now abandon Claims Two, Six, Twelve, Thirteen, Fourteen, Fifteen, Sixteen, Nineteen, Twenty, and the remainder of Twenty-one."). The district court did not address the claim because it had been abandoned. Over McGuire's objections, the district court adopted the magistrate judge's reports and recommendations and denied the petition. This court affirmed, *McGuire*, 619 F.3d at 631, and the Supreme Court denied certiorari, 131 S. Ct. at 2103.

In September 2012, McGuire filed his Rule 60(b) motion seeking to reopen his habeas proceedings to pursue the second ground for relief raised in his habeas corpus petition, relying primarily upon the Supreme Court's decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). *Martinez* held that:

> [w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. at 1320. The case was referred to a magistrate judge, who issued a report recommending the denial of the motion. McGuire submitted timely objections. The magistrate judge then issued a supplemental report, again recommending the denial of the motion. McGuire again entered timely objections. The district court adopted the magistrate judge's report and recommendations and denied the motion, concluding that *Martinez* was not applicable to McGuire's claim:

The Sixth Circuit has not directly addressed whether *Martinez* should apply in Ohio when a post-conviction defendant cannot assert his ineffective assistance of trial claim on direct appeal. However, those are not the circumstances here. McGuire asserted his ineffective assistance of trial counsel claim for the first time on direct appeal, and only thereafter in the post-conviction proceedings. Therefore, his subclaim does not fall within the limited exception provided for in *Martinez* for ineffective assistance of trial counsel claims which were required to be raised in post-conviction collateral proceedings. It follows that McGuire has not established that extraordinary circumstances exist pursuant to Rule 60(b)(6) to reopen the ineffective assistance of trial counsel subclaim in the Second Ground for Relief.

McGuire's counsel filed a notice of appeal from the district court's judgment. Two months later, the Supreme Court decided *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), a case that expanded and clarified *Martinez*. The district court subsequently certified the following issue for appeal: "whether *Martinez* justifies granting Petitioner relief from judgment in this case on his Second Claim for Relief regarding the alleged ineffectiveness of his trial counsel."

*Martinez* and *Trevino* created an exception to the rule that ineffective assistance of counsel in state post-conviction collateral proceedings cannot serve as cause for procedural default. In *Coleman v. Thompson*, the Supreme Court reasoned that "[t]here is no constitutional right to an attorney in state post-conviction proceedings," and that "[c]onsequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such procededings." 501 U.S. 722, 752 (1991). And in that case, "[b]ecause Coleman had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of Coleman's claims in state court cannot constitute cause to excuse the default in federal habeas." *Id.* at 757. In *Maples v. Thomas*, this rule was recognized and explained, although not applied when, unlike in the present case, post-conviction counsel abandoned his client. 132 S. Ct. 912, 922–27 (2012).

In *Martinez*, the Supreme Court carved out a "narrow exception" to *Coleman*, holding that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. at 1315. The Court held that:

> [w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 1320. In *Martinez*, the court applied this rule to hold that, because Arizona criminal procedure does not permit claims of ineffective assistance to be brought on direct appeal, the federal habeas court should have determined whether the attorney in the first collateral proceeding was ineffective in abandoning without arguing, and thereby procedurally defaulting, the claim of ineffective assistance of trial counsel. *See id.* at 1320–21.

*Martinez*'s apparent limit to those jurisdictions in which "claims of ineffective assistance of trial counsel *must* be raised in an initial-review collateral proceeding," *id.* at 1320 (emphasis added), was loosened in the Court's application of *Martinez* in *Trevino*. There, the Court interpreted *Martinez* as establishing a four-part test, under which a federal habeas court can

> find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

133 S. Ct. at 1918 (quoting *Martinez*, 132 S. Ct. at 1318–19, 1320–21) (emphasis in original). The Court modified the fourth requirement so that *Martinez* would apply in Texas, even though Texas criminal procedure "on its face appears to permit (but does not require) the defendant to raise the claim [of ineffective assistance of trial counsel] on *direct appeal*." *Id.* (emphasis in original).

The Court pointed out two elements of Texas criminal procedure that made a strict application of *Martinez*'s fourth requirement appear to be unjustified. First, the Court noted that "Texas procedure makes it 'virtually impossible for appellate counsel to adequately present an ineffective assistance [of trial counsel] claim' on direct review." *Id.* (quoting *Robinson v. State*, 16 S.W.3d 808, 811 (Tex. Ct. Crim. App. 2000)) (alteration in original). This is because under Texas criminal procedure time constraints and procedural hurdles render impracticable the development of evidence outside the trial record, which is often needed to present a claim for ineffective assistance of trial counsel. *See id.* at 1918–19. The Court suggested that "as a systematic matter, Texas [does not] afford[] meaningful review of a claim of ineffective assistance of trial counsel." *Id.* at 1919. Second, the Court noted that, "were *Martinez* not to apply, the Texas procedural system would create significant unfairness," because Texas courts in their holdings, and the Texas criminal bar in their practice, have followed the principle that claims of ineffective assistance of counsel are generally inappropriate on direct review and should typically be brought on collateral review. *Id.* at 1919–20.

The Supreme Court concluded "that the Texas procedural system—as a matter of its structure, design, and operation—does not offer most defendants *a meaningful opportunity* to present a claim of ineffective assistance of trial counsel on *direct appeal*." *Id.* at 1921 (emphasis added). The Court held that *Martinez* applied to the Texas system and that ineffective assistance of post-conviction counsel at an initial-review collateral proceeding could be cause to excuse a procedural default. *Id.*

McGuire argues that *Trevino* expands *Martinez* to jurisdictions like Ohio, on the theory that ineffective assistance of trial counsel cannot be meaningfully litigated on direct review because the state provides no procedural mechanism to expand the record on direct review. Thus, McGuire contends, the post-conviction proceeding is the first meaningful opportunity to present ineffective assistance of trial counsel claims that depend upon evidence outside the record. We have not directly addressed the applicability of *Martinez* in light of *Trevino*. In *Moore v. Mitchell*, we concluded that *Martinez* does not apply in Ohio because Ohio permits ineffective assistance of trial

counsel claims to be made on direct appeal, *see* 708 F.3d 760, 785 (6th Cir. 2013), but that decision was issued before *Trevino*.

## II.

This case has been thoroughly litigated in the state courts and on federal habeas through to the United States Supreme Court. The brutal crime for which defendant was convicted and sentenced occurred in 1989. Federal habeas corpus was finally denied by the district court in 2008, and that decision was upheld in the United States Supreme Court in 2011. Petitioner seeks to reopen that final judgment under Federal Rule of Civil Procedure 60(b)(6), which permits the opening of final judgments in extraordinary circumstances. At the time that the district court below denied the Rule 60(b) motion, the district court clearly did not abuse its discretion, in light of our court's pre-*Trevino* rejection of the applicability of *Martinez* with respect to Ohio law. *Moore*, 708 F.3d at 785; *see also Coyer v. HSBC Mortg. Servs., Inc.*, 701 F.3d 1104, 1110 (6th Cir. 2012) (stating abuse of discretion standard for denials of Rule 60(b) motions). The only question before us now is whether the Supreme Court's recent *Trevino* decision requires a different result. *Trevino* does not, however, require a different result, because intervening law does not generally permit the re-opening of finally decided cases, and even if it does in some truly extraordinary cases, this is not such a case.

None of the enumerated grounds for relief under Rule 60(b)(1)–(5) applies in this case, so McGuire must rely for relief upon the catchall provision, Rule 60(b)(6), which provides for relief from a final judgment for "any other reason that justifies relief." "Relief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation. This is especially true in an application of subsection (6) of Rule 60(b), which applies only in exceptional or extraordinary circumstances which are not addressed by the first five numbered clauses of the Rule." *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465, 468 (6th Cir. 2007) (alteration and quotation marks omitted) (citation omitted). Relief is limited to "unusual and extreme situations where principles of equity *mandate* relief." *Id.* (quoting *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 365 (6th Cir. 1990)). "The decision to grant Rule

60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts." *Thompson v. Bell*, 580 F.3d 423, 442 (6th Cir. 2009) (quoting *Blue Diamond Coal Co. v. Trustees of UMWA Combined Benefits Fund*, 249 F.3d 519, 529 (6th Cir. 2001)) (alteration omitted).

The single fact that *Trevino* has been decided does not change the balance of these factors sufficiently to require Rule 60(b) relief. It "is well established that a change in decisional law is usually not, by itself, an 'extraordinary circumstance' meriting Rule 60(b)(6) relief." *Stokes v. Williams*, 475 F.3d 732, 735 (6th Cir. 2007) (quoting *Blue Diamond*, 249 F.3d at 524)); *see also Gonzalez v. Crosby,* 545 U.S. 524, 536–37 (2005).[1]

First, it is solely a change in the law "by itself" that could even arguably provide for relief from the final judgment in this case. No development other than the *Trevino* decision has been suggested. In particular, there are no newly developed facts since the denial of McGuire's federal habeas petition became final in April 2011.

Second, the change in the law resulting from the recent *Trevino* decision is flatly not a change in the constitutional rights of criminal defendants, but rather an adjustment of an equitable ruling by the Supreme Court as to when federal statutory relief is available. The Supreme Court disclaimed any change in the constitutional ground rules for determining guilt or innocence in a criminal case in *Martinez*, instead basing the decision on the courts' equitable power. *See* 132 S. Ct. at 1319.

---

[1]In *Gonzalez* the Court reasoned in part as follows:

> [N]ot every interpretation of the federal statutes setting forth the requirements for habeas provides cause for reopening cases long since final. If [one new precedent] justified reopening long-ago dismissals based on a lower court's unduly parsimonious interpretation of § 2244(d)(2), then [another intervening precedent] would justify reopening long-ago grants of habeas relief based on a lower court's unduly *generous* interpretation of the same tolling provision.

*Id.* at 536–37.

Third, while we need not determine whether *Trevino* applies to Ohio cases, it is not obvious that *Trevino* applies here. Ohio law appears to contemplate two kinds of ineffective assistance of counsel claims, those based only on evidence in the trial record and those based in part on evidence outside the record. Ohio also appears to expect appellate counsel to recognize the types of claims and follow the proper procedure. As to the first type of claim, res judicata bars an ineffective assistance of counsel claim that relies entirely on evidence inside the trial record, since such a claim could have been brought on direct appeal. This is because in Ohio,

> [u]nder the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment.

*State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967). Since it is "a bedrock principle of appellate practice in Ohio . . . that an appeals court is limited to the record of the proceedings at trial," *Morgan v. Eads*, 818 N.E.2d 1157, 1159 (Ohio 2004), the second type of claim, ineffective assistance of counsel contentions that rely on evidence outside the record, cannot be brought on direct review. In *State v. Cole*, the Ohio Supreme Court explained:

> Generally, the introduction in [a postconviction] petition of evidence *dehors* the record of ineffective assistance of counsel is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of *res judicata*. In the case at bar, however, the allegations outside the record upon which appellant relies appear so contrived, when measured against the overwhelming evidence in the record of trial counsel's competence, as to constitute no credible evidence and, thus, to justify the trial court's application of the principles of *res judicata*.

443 N.E.2d 169, 171 (Ohio 1982). However, "[a] petition for postconviction relief is subject to dismissal without a hearing when the petitioner fails to submit with his petition evidentiary material setting forth sufficient operative facts to demonstrate

substantive grounds for relief." *State v. Sowell*, 598 N.E.2d 136, 142 (Ohio Ct. App. 1991); *see also* Ohio Rev. Code Ann. § 2953.21(C).

Thus, Ohio law suggests two different ways to look at *Trevino*. On the one hand, certain claims can for practical purposes only be brought in an initial-review collateral attack in a post-conviction petition. And *Trevino* recognized that a "meaningful opportunity to present a claim of ineffective assistance of trial counsel" includes "the need to expand the trial court record." 133 S. Ct. at 1921. Ohio courts recognize that claims requiring evidence outside the record may only be meaningfully litigated in post-conviction proceedings and may loosen ordinary res judicata principles in such cases: "although ineffective assistance of counsel ordinarily should be raised on direct appeal, res judicata does not bar a defendant from raising this issue in a petition for postconviction relief if the claim is based on evidence outside the record[,] . . . even when the issue of ineffective assistance of counsel was raised on direct appeal." *State v. Richmond*, No. 97616, 2012 WL 2047991, at \*1 (Ohio Ct. App. July 2, 2012) (citing *State v. Smith*, 477 N.E.2d 1128, 1131 n.1 (Ohio 1985)). Thus, in Ohio, if ineffective assistance cases are divided into two categories, one could argue that the category requiring evidence outside the record must be brought on collateral review in order for review to be meaningful.

On the other hand, in the "ordinary" case, "ineffective assistance of counsel at mitigation, just like ineffective assistance at trial, is an issue that can be brought on direct appeal," *State v. Combs*, 652 N.E.2d 205, 212 (Ohio Ct. App. 1994) (collecting cases), with a constitutionally required appellate attorney, *see Franklin v. Anderson*, 434 F.3d 412, 428 (6th Cir. 2006) (citing *Evitts v. Lucey*, 469 U.S. 387, 396 (1985)); *see also State v. Davis*, 894 N.E.2d 1221, 1226 (Ohio 2008); Ohio R. App. P. 26(B). Indeed, such a claim was raised on McGuire's direct appeal, and was treated thoughtfully by the Supreme Court of Ohio on discretionary review, albeit as part of an ineffective assistance of appellate counsel claim. Arguably, then, the review of trial counsel ineffectiveness claims in Ohio is more "meaningful" than in Texas, because in Ohio there is "ordinarily" the availability of direct review with constitutionally required

counsel, with the back-up of collateral attack where evidence outside the record is required.  All of this shows that the application of *Trevino* to Ohio ineffective-assistance claims is neither obvious nor inevitable.

Fourth, even if *Trevino* changed the law in some Ohio cases and even if a pure change in law could warrant Rule 60(b)(6) relief in truly extraordinary cases, there is nothing extraordinary about this case because the underlying reasons for the *Trevino* gloss on *Martinez* at best apply weakly in this case.  Above all and as shown, McGuire on direct appeal did make a challenge to the effectiveness of trial counsel with second-tier appellate counsel whose effectiveness is not now at issue.  Indeed, the Ohio Supreme Court rejected claims that parallel those made in the Rule 60(b) motion and in the briefs before us now.  *See McGuire*, 686 N.E.2d at 1120. The supreme court rejected a claim of inadequate preparation and presentation of mitigation evidence because counsel should have hired a mitigation specialist, and rejected the argument that trial counsel should have called more than just the two members of McGuire's family to testify in the penalty phase.  *Id.* The supreme court also rejected an argument that the defense psychologist who testified on McGuire's behalf was inadequately prepared.  *Id.*

To be successful under *Trevino*, moreover, McGuire must show a "substantial" claim of ineffective assistance, *Trevino*, 133 S. Ct. at 1918, and this requirement applies as well to the prejudice portion of the ineffective assistance claim.  McGuire's claim, for the reasons given in the next section, is likely not sufficiently substantial to meet this element of the *Martinez* exception.

### III.

Even with the evidence that McGuire asserts should have been uncovered and presented by trial counsel, McGuire's claim for ineffective assistance of trial counsel is not particularly compelling.  "To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's performance was deficient and that it prejudiced him."  *Nichols v. Heidle*, 725 F.3d 516, 539 (6th Cir. 2013) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

A comparison of the mitigation evidence that was presented at trial to that which McGuire claims should have been presented does not compel the conclusion that McGuire's underlying claim for ineffective assistance of trial counsel is substantial. Although in his second petition for post-conviction review, McGuire presented additional and more detailed evidence of his impoverished upbringing and unstable family life, none of the testimony from his other family members changes substantially the picture of the case presented to the jury. Furthermore, it appears that the penalty phase counsel was entitled to rely upon the psychological assessment of Dr. Kuehnl, the psychological expert who testified at the sentencing hearing.

The following individuals testified on McGuire's behalf at the penalty phase: Mary C. Beedy, record office supervisor at the Madison Correctional Institution in London, Ohio; Doris Jean Newton, McGuire's mother; Tonya May Cross, McGuire's half-sister; Phyllis Kuehnl, Ph.D., a licensed psychologist; and McGuire himself.

As these witnesses explained, McGuire's challenges in life began before he was born: Newton, McGuire's mother, testified that McGuire was born at home, rather than in a hospital, and that she had no medical care during the pregnancy. At that time, she and Genis Ray McGuire, the father, already had a son, Genis Jr. ("Junior"); and they had a daughter after Dennis, although Newton left McGuire's father when she was three months pregnant with the daughter. Newton and Genis divorced in 1962, when Dennis was about three years old. Newton testified that McGuire had no relationship with his father; after the divorce, Genis and two of his brothers forcibly entered Newton and her mother's home and took Junior away. Genis took Junior out of the state, and Newton did not see Junior for over three years after that. The young McGuire predominantly lived with Newton, though he occasionally ran away to Genis's house. McGuire testified that he and his biological father "never got along. I never called him Dad, and he never called me son."

While McGuire was growing up, his mother was married to six different men. All of the marriages ended in divorce. Newton testified that after McGuire's father she married Donald Douglas Konz, with whom she had two children, a son named Randall

and a daughter named Tonya. Newton divorced Konz after six years, and she next married Ronald K. Baker for "[a]bout a year" before they too divorced. Newton was then married to Danny Raney for "[a]bout three years," and next to Jerry Wayne Miller for "[p]robably about two years." Those marriages also ended in divorce. Newton was finally married to Leon Eugene Newton, but the marriage ended much like the others: they were "only together three months, but . . . weren't divorced for a couple years."

McGuire witnessed and personally suffered abuse from the parade of step-fathers in his life. Newton testified that the young McGuire suffered a "[l]ot of mental abuse but not no physical abuse much" from this series of step-fathers. Newton acknowledged that they would treat him "poorly" and "call him names." Tonya Cross recounted in her testimony how McGuire's step-fathers would abuse him "verbally" with "[h]ollering and the yelling." Newton added that Genis, Raney, and Miller were abusive to her. She stated that Genis "beat [her] for eight hours," leaving her "whole left side paralyzed"; Raney "busted [her] nose" after hitting her in the face once, for which she went to the hospital; and Miller "grabbed [her] by the hair of the head" and did similar such things (although he did not hit her). Newton testified that she intermittently lived with Norman Mullins, whom she never married. Newton testified to how the young Dennis witnessed the abusive Mullins terrorizing the household:

> Q. And was Norman Mullins also abusive to you?
>
> A. Mostly mentally to me. Yea. And he'd come in—my brother and sister, they stayed with me. I took care of them also for awhile. And I'd get on him because he wouldn't work or anything, and he'd get drunk and come in. Throw everybody in the house out. Denny B., I could just look at him and he'd go call the law.

Newton explained that "Denny B." was McGuire and acknowledged that he was "the man of the house." Newton stated that when she was being beaten, McGuire "[w]as always by [her]" and would often call the police for help. Tonya Cross confirmed that "some times when [their] mom's husbands . . . would . . . get in arguments or something, and Denny would have to go for the law." This was "Denny's job," which he had to do "pretty much" "on a regular basis." McGuire said he had "jumped out of two story

windows," "got hit a couple times trying to keep 'em from hurtin' [his] mother," and "ran after the cops, [he] couldn't count [how many times]." Despite all the boyfriends and husbands that may have disturbed her maternal relationship with McGuire, Newton "d[id]n't think he ever felt unloved or anything though. By me."

McGuire apparently had immense difficulties in school and never progressed very far in his education. Newton testified that McGuire was "[a] poor student." Newton stated that she moved as a result of her relationships and that, in turn, McGuire "[b]ounced around . . . a lot" through various school systems. When McGuire was in school, he did not attend it regularly, since he "just didn't like school." Tonya Cross believed that "he was gone more than he was there." According to Newton, McGuire dropped out shortly after starting the tenth grade. As for his poor academic performance, Newton said that McGuire "couldn't do the work" and that "[i]n the 8th grade he couldn't read 2nd grade work." McGuire performed so poorly that Raney threatened to cut McGuire's hair if he did not do his school work. Newton suggested during her testimony that McGuire could barely read or write. Tonya Cross recalled during her testimony that McGuire had to have his driver's license exam administered verbally because he couldn't read and write well enough to take it on paper.

In addition to struggling academically in school, McGuire faced bullying from fellow students. Newton testified that McGuire was "chubby" in the third or fourth grade and was also, in quite a literal sense, tongue tied: "His tongue was stuck to the roof of his mouth, that little thing there, and we had to go have it clipped, or his tongue wouldn't move." After this operation, McGuire suffered from a speech impediment; he "stuttered" and "had a lot of problems" with his speech, to the point that he had to attend speech therapy. Because of his speech difficulties and weight, McGuire was called "Mushmouth" and "Fatso" by other children, but he "was always—pretty much kinda sissy and he wouldn't fight." McGuire testified to physical abuse from black students when he went to Trotwood, a school with significant racial tensions:

> And there was days I come home, black eyes, busted nose and stuff.
> Where most of the black kids on the bus started beating up us white ones.
> And I quit going to school. . . . I tried to. I really tried to. I tried going to

school. I tried to get my education.  But I couldn't get around those whoopings.  And I wasn't going to school and getting beat up every day. I wasn't going to do it.  I'm tired of black guys, and my head getting busted and baseball bats and stuff.  So I quit.

A miserable upbringing preceded the immediate receipt of adult responsibilities. Newton testified that McGuire moved out when he was eighteen and married a woman named Darlene.  Darlene and McGuire lived with three children, one of whom was from Darlene's prior relationship.  Based on the "few times" Newton saw them at home, to her they "seemed like a happy family."  Tonya Cross agreed that "the children seemed happy," and that McGuire would play with the children, whom he "seem[ed] to love." However, this short marriage apparently ended in divorce shortly after his incarceration for the murder of Joy Stewart, and McGuire had  seen his children only twice in the penal institution since the divorce.

Dr. Kuehnl testified as an expert in psychology, and based her testimony on two hours spent in a personal interview with McGuire, a review of the discovery packet and his school records, and some time spent interviewing his family members.  Dr. Kuehnl testified that McGuire "came across as a man who had grown up through a series of turbulent relationships that left him with few social skills."  She testified to the importance of stable bonds in a child's development and opined that McGuire's early life was "erratic, and didn't provide him with very much predictability."  The fact that he was "rejected by his father, who chose not to have any additional contact with him, would certainly cause him—would cause him to feel insecure and unloved in spite of what [his] mother might be attempting to portray at that point."  Dr. Kuehnl also discussed McGuire's use of marijuana from the age of 9 and how this indicated that McGuire had "withdrawn from the fight so to speak"; the marijuana "numbed his view of the world," which helped him through "the disintegration of the family unit."

This evidence does not materially differ in quantity and quality from the evidence—several affidavits from family members—that McGuire submitted in support of his successive state post-conviction petition.  What the affidavits recount is

substantially similar in content to the testimony of Newton, Tonya Cross, and McGuire himself.

For example, Randy Konz, McGuire's half-brother, provided a short affidavit in support of McGuire's successive state post-conviction petition. Regarding McGuire's personality, Randy averred: "[McGuire] got along with everyone. Black kids at Trotwood picked on him. The school had a lot of racial problems." McGuire's testimony covered this. As Newton, McGuire, and Cross attested to, Randy also discussed "how during fights between my mother and one of her husbands or boyfriends, [McGuire] would climb out the windows to get the neighbors' help." About their respective childhoods, Randy explained:

> My brother had it harder than I did. The hardest part for Dennis was that he had to raise himself. Our mother was out bar hopping. She always had lots of boyfriends. She and the kids often didn't have money for food. Dennis had to steal food to eat. I think she may have left Dennis and Mary Beth alone for a few days at a time.

Randy, like Newton and Cross at the sentencing hearing, noted that McGuire had difficulty reading and "avoided situations when he had to read"; McGuire passed his driver's test only when he could take the oral version. Randy's affidavit did not entirely support mitigation; such as when he stated that McGuire had a reputation as a "snitch," and when Randy expressed a belief that Newton "ignore[d] Tonya and me" and "only seemed to care about Dennis and Mary Beth[, Newton's daughter with Genis]."

Don Konz, Newton's second husband, also provided a short affidavit. After the divorce, Konz saw McGuire only when Konz took Tonya to see her mother, at which time she was living with Norm; McGuire "didn't seem to be happy." When he was eighteen years old, McGuire lived with Konz "for two months" while McGuire worked at TGI Friday's. McGuire and his children lived with Konz "for about a week" when McGuire's wife "kicked him out"; McGuire "took care of his kids like a mother hen." Konz noted that Genis denied that McGuire was his son. Konz also recounted McGuire's speech impediments and academic difficulties, although those topics were discussed at length at the sentencing hearing. Konz also discussed disciplinary routines

in the household:  Doris and he "usually made Dennis sit in a room, stand in a corner, or go without TV for awhile," but "[m]ost of the time Doris and I gave the kids a couple of cracks on the butt."  This testimony adds little to the whole picture.  Almost an entire page of the affidavit discussed Konz's and Newton's problems with alcohol and fidelity, problems with only limited direct relevance to McGuire.

Mary Elizabeth Malicote, McGuire's younger full sister, provided another short affidavit in support.  She averred that their father, Genis, did not pay child support and the family experienced "hard times financially," including "times when we ate mostly bologna sandwiches with chips and soup," but they would have "a new outfit for school even if it was inexpensive."  During Newton's marriage to Konz, he "made [McGuire] eat a bar of soap after I told him [McGuire] spat on me," and would also "pok[e] his finger in [McGuire's] face and call[] him stupid."  Malicote mentioned McGuire's role in getting the police when their mother was being abused, although that was covered at the sentencing hearing.  Malicote's testimony was also cumulative to the extent it covered McGuire's difficulties in school, both academically and socially.  About a fourth of the short affidavit discusses Malicote's own difficulties in life, which only in a very indirect way help McGuire's case for mitigation.  Besides providing a couple of anecdotes and more detail, Malicote's testimony is cumulative.

Nola Stewart, McGuire's maternal aunt and younger sister to Newton by twenty-two years, provided yet another affidavit.  The first four pages of the affidavit concern family history from before McGuire entered the picture, although Stewart does aver that her mother, McGuire's grandmother, did not help Newton with McGuire even though the child was often hungry.  Stewart did say that McGuire "didn't have much to eat when he was little."  Stewart indicated that McGuire's circumstances improved between the ages of ten and fifteen years old:

> Doris drew welfare.  She was divorced from Don Konz by that time.  She had a nice apartment and plenty of food.  I think she also received housing assistance.  Doris had gotten her life on track.  She had always tried, but she chose bad men.  Her children may have been malnourished, but she never physically abused them.  She was always affectionate and

> loving with them. Most of her marriages ended because of the kids. If the men didn't like them, she told them to leave.

Stewart stated that Newton attempted suicide, although she did not provide any details. Most of the rest of the affidavit is cumulative of the evidence presented at the sentencing hearing, especially her statements regarding McGuire's lack of education and the abusive relationships Newton had with other men.

Tonya Cross and Doris Newton, McGuire's half-sister and mother who had both testified at the sentencing hearing, provided two more affidavits in support of McGuire's second state post-conviction petition. A large portion of Cross's affidavit discussed her family history. Otherwise, Cross's and Newton's affidavits largely track their testimony at trial, and they therefore do little if anything to advance McGuire's case that the failure to introduce additional testimony from either of them in any way prejudiced him at sentencing.

It is far from clear that McGuire has presented sufficient evidence of prejudice to make a successful *Strickland* claim. Most of the information contained in the various affidavits had already been presented through the testimony at trial, especially regarding McGuire's trouble in school, teasing from other children, and his dysfunctional, unstable family life. To the extent the affidavits present new information, that information either does not relate to McGuire (Stewart provided background history about her parents), comes from an unreliable source (Randy averred that he did not live with Newton), or adds little substantive impact to that information presented to the jury (Cross, Malicote, Newton, and Stewart explained in their affidavits that Newton's relationships were abusive, McGuire acted as the "man of the house," and McGuire did not perform well academically). Notwithstanding the allegedly deficient performance arising from trial counsel's failure to talk to each of the affiants, McGuire cannot show prejudice because the new evidence he proposes should have been introduced at trial is cumulative. As we explained in *Hill v. Mitchell,* 400 F.3d 308, 319 (6th Cir. 2005), "in order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at

sentencing." The introduction of additional examples to fill out the narrative that was formed of McGuire's life at the sentencing hearing is not enough to demonstrate prejudice. This is similar to our reasoning in *Jackson v. Bradshaw*, 681 F.3d 753, 770 (6th Cir. 2012), where we held that, "[w]hile the latter evidence sharpens the outlines of Petitioner's personal history from the picture offered at trial, the extra benefit to Petitioner resulting from the increased specificity is marginal and, therefore, insufficient to support the conclusion that counsel erred by failing to proffer these more specific details."

Lastly, McGuire attempts to rely upon a report from Kathleen J. Burch, Psy.D., a clinical psychologist. This final bit of evidence was not presented during state post-conviction proceedings, but was brought only during federal habeas proceedings in a motion to expand the record. Dr. Burch conducted a battery of tests, which demonstrated that McGuire has cognitive dysfunction, manifests a passive-aggressive or paranoid personality disorder, and suffers mood disturbances, including a susceptibility to depression. However, Dr. Burch concluded that:

> The results of the psychological assessments performed . . . do not suggest the presence of a major mental illness. They do[] suggest, however, certain deficits in his ability to effectively regulate his behavior and deficits in his interpersonal functioning, that would have relevance to his everyday behavior, including his criminal behavior. . . . These deficits reflect and result from impairments in the functioning of his brain. These impairments may be largely, or entirely, inborn; the reported history of serious learning problems and behavior problems among family members suggests that he is likely constitutionally predisposed to act impulsively and unreflectively. . . . Mr. McGuire gave . . . a history of significant substance abuse and various closed head injuries that might also account for some of his brain-based impairments of thinking and behavior.

There is no serious prejudice from the jury's inability to consider Dr. Burch's analysis, for her conclusions, although arrived at through more comprehensive clinical evaluation, do not appear to be greatly different from the conclusions Dr. Kuehnl made at the sentencing hearing. Furthermore, it does not appear that Dr. Burch's conclusions would have been particularly helpful to the jury, as they are mostly provisional, intuitive,

or inconclusive. Dr. Burch suggests only the possibility of organic brain tissue damage without corroboration. Dr. Burch's reference to a "constitutional[] predispos[ition] to act impulsively and unreflectively" is to some extent inherent in McGuire's crime itself. Perhaps most importantly, none of McGuire's psychological aberrations rises to the level of "major mental illness." The cases cited by McGuire involve much different and more serious deficiencies in the presentation of competent defense expert testimony: an expert who testified at the sentencing hearing that she was not equipped to perform additional diagnostic tests to detect organic brain dysfunction that she thought was likely, *Powell v. Collins*, 332 F.3d 376, 384 (6th Cir. 2003); a failure to present any information about the defendant's bizarre, nightmarish personal history, and instead just presenting an unsworn statement by the defendant in mitigation, *Coleman v. Mitchell*, 268 F.3d 417, 445–56, 450–51 (6th Cir. 2001); no provision of expert testimony except expert testimony that was guided by the prosecution and which was unchallenged by the defense, *Glenn v. Tate*, 71 F.3d 1204, 1209–10 (6th Cir. 1995); or no "thorough investigation of [the defendant's] mental health, even after [the defendant's] mother alerted them that [the defendant] suffered from mental illness," *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005).

In addition, McGuire's trial-level counsel was entitled to rely on the conclusions arrived at by Dr. Kuehnl after her examination of McGuire. Dr. Kuehnl appears to have conducted herself in a professional and efficient manner, and McGuire makes no persuasive argument to the contrary. Rather, McGuire emphasizes that Dr. Kuehnl presented nothing in the form of an "organic explanation." However, the fact that Dr. Kuehnl approached McGuire's case as one of family dynamics and social history does not dilute its significance; and indeed, such testimony may be more intuitively helpful to a jury than more specialized neuropsychological explanations. Absent a showing that trial counsel reasonably believed that Dr. Kuehnl was somehow incompetent or that additional testing should have occurred, simply introducing the contrary opinion of another mental health expert during habeas review is not sufficient to demonstrate the ineffectiveness of trial counsel. *See Black v. Bell*, 664 F.3d 81, 104–05 (6th Cir. 2011).

IV.

In the end, the strong policy of maintaining the finality of judgments, especially following two state court collateral attacks and a federal collateral attack that was litigated to the United States Supreme Court, the single fact of an intervening Supreme Court decision, unclear in its relevance to this claim, is not sufficient to warrant reopening the final judgment against the defendant.

There is one case in which we have ordered Rule 60(b)(6) relief based on an intervening change in the law, *Thompson v. Bell*, 580 F.3d 423 (6th Cir. 2009). That case is materially different. *Thompson* involved a change in a state supreme court rule to the effect that discretionary review was not required in order for criminal defendants to exhaust their state appeals. The rule change—unlike the precedential development in this case—unquestionably applied to the facts of *Thompson*, in which federal habeas had been denied on the issues in question for failure to seek such discretionary review. *Id.* at 433. Moreover, this court in *Thompson* heard simultaneously both the appeal from the denial of the original federal habeas petition—which required reversal for independent reasons—and the appeal from the Rule 60(b) denial. *See id.* at 428, 443–44. Most significantly, however, in *Thompson* we departed from the acknowledged general rule against relief from final judgments based on a change in the law on the ground that that change was one of *state* procedural law. We reasoned:

> We agree that the enactment of [Tennessee Supreme Court Rule 39] is an extraordinary circumstance, and that nothing in the Supreme Court's opinion in *Gonzalez* undermined this Court's reasoning in [*In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004) ("*Abdur'Rahman I*"), *vacated by Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005)]. Unlike the Supreme Court in *Gonzalez,* which found that a change in federal decisional law by itself was not an extraordinary circumstance, this Court in *Abdur'Rahman I* found the enactment of TSCR 39 to be an extraordinary circumstance because refusing to recognize it "would *disserve* the comity interests enshrined in AEDPA by ignoring the state court's view of its own law." 392 F.3d at 187. A federal court's respect for another state's law was not at issue in *Gonzalez,* in which the Rule 60(b) motion was based solely on a change in federal decisional law interpreting a federal statute. *See also Blue Diamond,* 249 F.3d at 524 ("[A] change in decisional law is *usually* not, by itself, an 'extraordinary

circumstance' meriting Rule 60(b)(6) relief.") (emphasis supplied). Because this Court's reasoning in *Abdur'Rahman I* is still valid after *Gonzalez*, today we reaffirm our previous holding that a motion based upon the promulgation of TSCR 39 is an extraordinary circumstance warranting relief under Rule 60(b)(6).

*Id.* at 443. Thus the very basis for distinguishing *Gonzalez* in *Thompson* cuts against Rule 60(b)(6) relief in this case. McGuire's case does not involve a change in state law.

For these reasons, there was not a sufficient basis for the district court to provide relief under Rule 60(b)(6) from the final judgment of conviction and sentence in this case. The judgment denying Rule 60(b) relief is affirmed.