RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0210p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

GERALD HAND,

                *Petitioner-Appellant,*

    *v.*

MARC C. HOUK, Warden,

                *Respondent-Appellee.*

No. 14-3148

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:07-cv-00846—Sandra S. Beckwith, District Judge.

Argued: January 26, 2017

Decided and Filed: September 8, 2017

Before: BOGGS, CLAY, and ROGERS, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Jeanne M. Cors, TAFT, STETTINIUS & HOLLISTER, LLP, Cincinnati, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Jeanne M. Cors, TAFT, STETTINIUS & HOLLISTER, LLP, Cincinnati, Ohio, Jennifer M. Kinsley, KINSLEY LAW OFFICE, Cincinnati, Ohio, for Appellant. Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

───────────────

**OPINION**

───────────────

    BOGGS, Circuit Judge. This case presents a habeas petitioner who has been convicted of two counts of aggravated murder and sentenced to death. Over the span of nearly thirty years,

petitioner Gerald Hand married four women.  Three of those women would die, two of them victims of violent, unsolved home invasions.  The death of Hand's fourth and final wife, however, revealed a different story.  At home at the time of her death, Hand allegedly confronted and shot the intruder, who turned out to be his friend and employee Lonnie Welch.  Subsequent police investigation uncovered a decades-long plot conducted by Hand and Welch to murder Hand's wives in order to collect their lucrative insurance policies.  Having been convicted in state court and having exhausted his state appeals, Hand now brings this habeas corpus petition.  The district court denied the petition, and for the following reasons, we affirm.

I

A

In March 1976, Hand's first wife Donna was found strangled to death in the basement of their home.  She had also been struck on the head.  There were no signs of forced entry, but some items in the house had been disturbed.  Hand filed for and received $67,386 in life insurance proceeds and $50,000 from the Ohio Court of Claims victims-compensation fund.  Hand married his second wife, Lori, just over a year later in June 1977.  They had one son together, Robert Jr.  Like Donna, Lori was found strangled to death in the basement of their home.  Lori had also been shot twice.  Just as with Donna's murder, police found no signs of forced entry but some items in the house had been disturbed.  Hand also filed for and received over $126,000 in life insurance proceeds.  Although Hand was a suspect, neither Donna's nor Lori's murder was solved.  Hand married a third time, but that marriage ended in divorce.

Hand married his fourth wife, Jill, in 1992.  Hand moved into her house, and they remained married until her death on January 15, 2002.  On the night of her death, Hand called police and reported that a home intruder had shot his wife and that he had shot the intruder in self-defense.  The home intruder was later identified as Lonnie Welch.

The Supreme Court of Ohio best describes the police investigation that followed:

Police found Welch's body lying face down on Hand's neighbor's driveway. Inside Hand's house, Jill's body was found lying between the living room and the kitchen.  Hand told police that he had shot the intruder but did not know his

identity. He also gave police two .38-caliber revolvers that he used to shoot him. On the way to the hospital, Hand saw the intruder's vehicle and told Mark Schlauder, a paramedic, that "it could have belonged to somebody that worked for" Hand.

Around 8:00 p.m. on January 15, Detective Dan Otto of the Delaware County Sheriff's Office interviewed Hand at the hospital. Hand said that after arriving home, he had dinner with Jill and then went to the bathroom. Upon exiting, Hand heard Jill scream, "Gerald," heard two gunshots, and saw a man in a red and black flannel shirt at the end of the hallway. Hand then retrieved two .38 caliber revolvers from the master bedroom. Hand started down the hallway firing both guns at the intruder, but had trouble shooting because the guns were "misfiring" and "missing every other round." Hand followed the intruder out the front door and continued firing at him as he ran toward his car, and then the intruder fell on the neighbor's driveway.

During the interview, Hand repeated that he did not recognize the gunman, but recognized Welch's car in the driveway. Hand said he "didn't know [Welch] that well; that he did odd jobs around the shop; that he was a thief; that he was a cocaine addict; that he * * * [came] in to the shop area from time to time." Hand also said that it had been a year since he had had any contact with Welch, and Welch had no reason to be at his home that night.

Investigators found no sign of forced entry at Hand's residence. Blood spatters were found inside the front door and on the front-door stoop. The top of the storm door was shattered, and particles of glass extended 13 feet into the front yard. All the glass fragments were found on top of the blood spatters. Police also found a black jacket on the front stoop, a spent bullet and glass fragments on top of the jacket, and a tooth outside the front door.

According to Agent Gary Wilgus, a crime-scene investigator, the blood spatters indicated that the victim was bleeding and "blood was dropping from his body" as he was moving away from the house. A bloody trail led onto the sidewalk and through the front yard and ended where Welch was lying in the driveway. Welch was wearing cloth gloves, and a knit hat with two eyeholes and a mouth hole was next to his head. Police also found a .32-caliber revolver on the front lawn.

Inside the house, police found glass fragments and bloodstains extending two to three feet from the front door and another tooth just inside the front door. Jill's body was 12 feet from the front door, her legs pointed towards the front door, and she was wearing a nightgown. Jill had been shot in the middle of her forehead. A second bullet deflected off the floor and was found on the carpet next to Jill's head.

Investigators found a bullet in the living room ceiling, and a second bullet was found in the living room window frame. While investigators could not determine

the exact trajectory of the two bullets, they determined that they most likely originated from gunshots in the hallway area. No evidence of gunplay was found elsewhere in the house.

On January 17, 2002, Detective Otto reinterviewed Hand, and Hand provided a different version of events. Hand stated that after his wife was shot, he retrieved two guns from the master bedroom, went into the hallway, and saw Welch "coming down the hallway towards the master bedroom at him." Hand and Welch then began firing at each other in the hallway and were within four feet of each other during the gun battle. Hand repeated that he chased Welch outside the house but "couldn't get his guns to fire; that he was missing every other round and * * * they weren't firing." When asked about the .32-caliber revolver in the front yard, Hand stated that he did not know who owned it.

During the second interview, Hand said, "I was misquoted on the first interview at the hospital" about not knowing Welch. Hand said that he had known Welch, a former employee, for over 20 years. However, Hand continued to give the impression that they were not close. When asked about a wedding photo showing Welch as his best man, Hand said he "couldn't find anybody else to stand in as [his] best man." Hand repeated that "the only thing he saw" on the night of the murder was an unknown person in "red and black flannel," and he had "no clue who this unknown person was." Hand also said that "Jill had never met Lonnie; Lonnie's never been to Walnut Avenue; he had no idea why he was there."

In discussing his financial situation, Hand said he sold his radiator shop in October 2000 and received $ 300,000, and later received $ 33,000 from the sale of his share of the business and its inventory, and $ 140,000 from somewhere else. Hand said he "always needed money, but if he needed money, he could get some; that he had money." Hand also told police that he was "hiding the money and that he was considering filing bankruptcy; that that was against Jill's wishes." Later, Hand said that he "wasn't going to file for the bankruptcy * * * and they were going to work it out." When asked if he had any offices, Hand said that his office was in a bedroom in the house. However, Hand failed to disclose that he kept business records at another location.

On January 19, 2002, the police seized several boxes containing Hand's business and personal records from the storage area above a hardware store near Hand's former radiator shop. These records included credit cards, credit-card-and-life-insurance-account information, payment receipts, a list of credit card debt prepared by Jill, and other information about Hand's finances.

Heather Zollman, a firearms expert, testified that the .32-caliber revolver found in the front yard was loaded with two fired and three unfired .32-caliber Smith and Wesson ("S & W") Remington-Peters cartridges. Bullet fragments removed from Jill's skull were consistent with being an S & W .32-caliber bullet. In testing the

.32-caliber revolver, Zollman found that "on more than 50 percent of [her] testing, the firearm misfired" as a result of "a malfunction of the firearm." The stippling pattern shown in Jill's autopsy photographs indicated that "the muzzle to target distance was greater than six inches, and less than two feet."

Zollman tested the two .38-caliber revolvers and found that they were both in proper working order, and neither weapon showed any tendency to misfire. A bullet removed from Welch's right forearm was "consistent with the .38 caliber." Zollman also concluded that the bullet and fragments recovered from Welch's mouth and his lower back had rifling class characteristics corresponding with the S & W .38-caliber revolver. Further, gunshot residue around the bullet hole on the back of Welch's shirt revealed a muzzle-to-target distance greater than two feet from the garment but less than five feet.

Jennifer Duvall, a DNA expert, conducted DNA testing of bloodstains found on the shirt Hand was wearing on the night of the murders. Five of the bloodstains were consistent with the DNA profile of Welch. The odds that DNA from the shirt was from someone other than Welch was "one in more than seventy-nine trillion in the Caucasian population; one in more than forty-four trillion in the African-American population, and one in approximately forty-three trillion in the Hispanic population."

Michele Yezzo, a forensic scientist, examined bloodstain patterns on Hand's shirt. There were more than 75 blood spatters of varying sizes on the shirt. Yezzo concluded that the shirt was "exposed to an impact" that "primarily registered on the front of the garment." Yezzo also examined glass fragments collected from Hand's residence and "found tiny fragments of clear glass" on Hand's shirt, trousers, tee-shirt, and pair of socks that he was wearing on the night of the murders. However, she found no glass fragments on Welch's boots. Yezzo conducted a fiber analysis of the bullet from Welch's mouth, but found "no fibers suitable for comparison."

Ted Manasian, a forensic scientist, found particles of lead and barium on both gloves that Welch was wearing, and these are "highly indicative of gunshot residue." Manasian could not determine how the gunshot residue got on the glove, just that it was there. Thus, Welch could have fired the gun, or was in the proximity of the gun when it was discharged, or handled an item that had gunshot residue on it.

Detective Otto testified that $ 1,006,645.27 in life insurance and state-benefit accounts were in effect at the time of Jill's death. This amount included $ 113,700 in Jill's Ohio Public Employees Retirement System account and $ 42,345.29 accumulated in the Ohio Public Employees Deferred Compensation program.

Dr. Keith Norton, a forensic pathologist in the Franklin County Coroner's office, conducted the autopsy of Jill and Welch. He concluded that Jill died from a single gunshot wound to the head. Dr. Norton found that Welch had been shot five times: in his mouth, left upper chest, left forearm, right shoulder, and lower back. The gunshot wound to Welch's lower back went into the spinal cord and would have paralyzed his legs. However, the gunshot wound to the chest was the cause of death.

According to Kenneth Grimes Jr., Hand's former cellmate in the Delaware County Jail, Hand told him that he "killed his wife and the man he was involved with." Hand said he hired a man and they had "been doing business together for years." Hand said he "hired the man to kill his wife and, in turn, the deal went sour. He wanted more money, so he killed two birds with one stone. He got both and didn't have to pay anything." Hand said he had agreed to pay $ 25,000 to have his wife killed, and the man "wanted it doubled." Hand said he was going to claim self-defense. He also said the evidence against him was "circumstantial and there were many witnesses that didn't have * * * any actual, proof."

*State v. Hand*, 840 N.E.2d 151, 165–68 (Ohio 2006).

In sum, Hand's conflicting statements about the night of Jill's death, in conjunction with forensic evidence and statements of other members of the community, strongly implicated Hand and Welch in a plot to kill Jill in order to collect her lucrative insurance policy and pensions. When Welch reneged on the deal and demanded more money, Hand allegedly killed him and staged the scene in order to claim self-defense.

Armed with this information, Ohio prosecutors sought and received a grand-jury indictment in state court against Hand on six counts. Counts One and Two charged Hand with the aggravated murder of Jill and Welch and included several death-penalty specifications: two "'course of conduct' specification[s]," (one for each count) *id.* at 170 (citation omitted), because the murders were part of a course of conduct involving the murders of two or more people; "three specifications of murdering Welch to escape detection for Hand's complicity in the murders of Donna, Lori, and Jill Hand; and two specifications of murdering Welch for the purpose of preventing his testimony as a witness in the murders of Donna and Lori Hand." *Ibid.* Counts Three, Four, and Five charged Hand with conspiracy to commit the aggravated murder of

Jill, and Count Six charged Hand with escape for his involvement in an attempt to escape police custody after he was arrested.[1] *Ibid.*

Hand pleaded not guilty. The jury found Hand guilty of all of the charges listed in the indictment. At the sentencing hearing, psychologist Dr. Daniel Davis testified about Hand's background and his ability to adjust to life in prison; Hand's son and another witness also testified on his behalf, and Hand submitted an unsworn statement. *Id.* at 188–89. The jury recommended the death penalty for both murders. *Id.* at 170. The judge accepted the jury's recommendation and sentenced Hand to death for Counts One and Two of the indictment. The judge also sentenced Hand to consecutive sentences of three years for two of the remaining counts of conviction.

B

Hand filed a notice of appeal to the Supreme Court of Ohio in 2003, raising therein thirteen "propositions of law" for relief:

**PROPOSITION OF LAW NO. 1**

Where the State fails to prove by clear and convincing evidence that a witness is unavailable due to a criminal defendant's wrongdoing, and the proposed evidence does not meet standards of reliability, it is constitutional error to admit this evidence against the defendant.

**PROPOSITION OF LAW NO. 2**

The introduction and admission of prejudicial and improper character and other acts evidence and the failure of the trial court to properly limit the use of the other acts evidence denied Gerald Hand his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the United States Constitution, Amends. V, VI, VIII, AND XIV; Ohio Const. Art. I, §§ 10 and 16.

---

[1]On November 26, 2002, while Hand was incarcerated in the Delaware County jail, correction officers discovered that Hand and three other inmates had attempted "to cut through the lock on the rear emergency exit of the cell block and through a cell bar." *Hand*, 840 N.E.2d at 168. Hand allegedly served as lookout and advised one of the inmates "on how to cut through the metal bar." *Ibid.*

**PROPOSITION OF LAW NO. 3**

It is prejudicial error for a trial court to join the unrelated charge of escape with charges of aggravated murder and conspiracy in violation of O.R.C. § 2941.04, thus prejudicing Appellant in violation of his constitutional protections.

**PROPOSITION OF LAW NO. 4**

Where the State has failed to present any evidence that a criminal defendant planned to break his detention, a conviction on the charge of escape is constitutionally infirm due to the insufficiency of the evidence to prove each element of the offense.

**PROPOSITION OF LAW NO. 5**

When the State proceeds on a theory that the defendant is the principal offender of an aggravated murder, it is error for the trial court to instruct the jury on complicity.  U.S. Const. VI, XIV.

**PROPOSITION OF LAW NO. 6**

The trial court's failure to give the required narrowing construction to a "course-of-conduct" specification in a capital case creates a substantial risk that the death penalty will be inflicted in an arbitrary and capricious manner in violation of the United States Constitution.  U.S. Const. Amends. VIII & XIV.

**PROPOSITION OF LAW NO. 7**

Where trial counsel's performance at voir dire and in the trial phase in a capital case falls below professional standards for reasonableness, counsel has rendered ineffective assistance, thereby prejudicing the defendant in violation of his constitutional rights.

**PROPOSITION OF LAW NO. 8**

Where trial counsel put on a very brief and skeletal presentation at the penalty phase, fail to argue residual doubt and fail to make any closing argument to the jury, counsel's performance is substandard and a capital defendant is prejudiced thereby.  U.S. Const. amends. VI, VIII, and XIV.

**PROPOSITION OF LAW NO. 9**

The capital defendant's right against cruel and unusual punishment and his right to due process are violated when the legal issue of relevance is left to the jury regarding sentencing considerations.  U.S. Const. amends. VIII, XIV.

**PROPOSITION OF LAW NO. 10**

A capital defendant's right against cruel and unusual punishment under the Eighth and Fourteenth Amendments is denied when the sentencer is precluded from considering residual doubt of guilt as a mitigating factor. The preclusion of residual doubt from a capital sentencing proceeding and the trial court's refusal to instruct the jury to consider it also violate the Defendant's due process right to rebuttal under the Fourteenth Amendment. The preclusion of residual doubt may also infringe a capital defendant's right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments. U.S. Const. Amends. VI, VIII, XIV; Ohio Const. Art. I, §§ 9, 10, 16.

**PROPOSITION OF LAW NO. 11**

Gerald Hand's death sentence must be vacated by this Court as inappropriate because the evidence in mitigation was not outweighed by the aggravating circumstances.

**PROPOSITION OF LAW NO. 12**

A capital defendant's right to due process is violated when the State is permitted to convict upon a standard of proof below proof beyond a reasonable doubt. U.S. Const. amend. XIV; Ohio Const. Art. I, § 16.

**PROPOSITION OF LAW NO. 13**

Ohio's death penalty law is unconstitutional. Ohio Rev. Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Gerald Hand. U.S. Const. amends. V, VI, VIII, [a]nd XIV; Ohio Const. Art. I, §§ 2, 9, 10, [a]nd 16. Further, Ohio's death penalty statute violates the United States' obligations under international law.

On January 18, 2006, the Ohio Supreme Court affirmed Hand's convictions and sentence. *State v. Hand*, 840 N.E.2d at 161. Hand filed a Motion for Reconsideration with the Ohio Supreme Court on January 30, 2006, in which he re-raised the first two propositions of law that the Ohio Supreme Court rejected on direct appeal. The court denied the motion on April 29, 2006.

While Hand's Motion for Reconsideration was still pending with the Ohio Supreme Court, Hand obtained new counsel who filed an application to reopen his direct appeal.**2** His application raised three new claims for relief:

**PROPOSITION OF LAW NO. 1**

Appellate counsel was ineffective for failing to raise the claim that appellant Hand's conviction was against the manifest weight of the evidence because the state failed to prove the underlying aggravating circumstances and specifications of Count 2, specifications 2-6, beyond a reasonable doubt. The conviction was, therefore, contrary to th[e Ohio Supreme] Court's holding in *State v. Odraye Jones*, 91 Ohio St.3d 335, 744 N.E.2d 1163 (2001).

**PROPOSITION OF LAW NO. 2**

Appellate counsel was ineffective for failing to motion the court to supplement their brief to include relevant and previously unavailable juror bias issues.

**PROPOSITION OF LAW NO. 3**

Appellate counsel was ineffective for failing to raise the issue that the trial court committed error by failing to conduct a constitutionally adequate inquiry to determine bias of jurors due to pre-trial publicity.

Hand's application, filed on April 18, 2006, was denied by the Ohio Supreme Court on August 2, 2006. *State v. Hand*, 852 N.E.2d 185 (Ohio 2006) (unpublished table decision).

While Hand's application to reopen his direct appeal was still pending, he also filed a petition for a writ of certiorari from the Ohio Supreme Court's original denial of his direct appeal with the United States Supreme Court. The Court denied Hand's petition on October 10, 2006. *Hand v. Ohio*, 549 U.S. 957 (2006).

Hand filed a second application to reopen his direct appeal pursuant to Ohio Supreme Court Practice Rule XI on September 24, 2007. Hand argued that his appellate counsel was ineffective for failure to raise the following three claims:

1) whether the death penalty specifications related to the murder of Hand's first wife were barred by the doctrine of collateral estoppel; 2) whether trial counsel

---

**2**See Ohio S. Ct. Prac. R. XI, § 6. Ohio permits an appellant in a death-penalty case to apply to reopen his direct appeal based on a claim of ineffective assistance of appellate counsel.

were ineffective for failing to object to questions, testimony, and evidence regarding Hand's bankruptcy attorney on the grounds of attorney-client privilege; and 3) whether the trial court erred in denying Hand's motion to dismiss the specifications relating to the murders of Hand's first two wives under Evid. R. 404(b).

Because Hand's application, filed over a year after his direct appeal had concluded, fell outside of the 90-day filing deadline, the Ohio Supreme Court denied it on December 12, 2007. *State v. Hand*, 877 N.E.2d 987 (Ohio 2007). This ended Hand's unsuccessful direct appeal.

C

On December 27, 2004, while Hand's direct appeal was still pending, he filed a petition for state post-conviction relief in the Delaware County Court of Common Pleas. His petition initially included ten claims for relief, but he subsequently amended his petition on February 9, 2005, to include two additional claims. In total, he raised the following twelve claims in state post-conviction relief:

**Ground for Relief No. 1**

Petitioner's conviction and sentence are void or voidable because the trial court failed to conduct a constitutionally adequate inquiry to determine juror bias due to pre-trial publicity. The court's error violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**Ground for Relief No. 2**

Petitioner's conviction and sentence are void or voidable because he was denied the effective assistance of counsel when trial counsel failed to adequately question prospective jurors with regards to their awareness of pre-trial publicity. The failure to act by defense counsel violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**Ground for Relief No. 3**

Petitioner's conviction and sentence are void or voidable because he was denied the effective assistance of counsel when defense counsel failed to make a motion for a change of venue. The failure to act by defense counsel violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth

Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**Ground for Relief No. 4**

Petitioner's conviction and sentence are void or voidable because his trial counsel failed to present compelling expert psychological evidence in his defense during the penalty phase of his capital trial. This inaction violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

**Ground for Relief No. 5**

Petitioner's convictions and sentence are void or voidable because his trial counsel failed to reasonably investigate and present compelling evidence, through family and friends, to mitigate the sentence of death. Therefore, Petitioner's rights were denied under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 2, 5, 9, 10, 16, and 20 of Article I of the Ohio Constitution.

**Ground for Relief No. 6**

Petitioner's convictions and sentence are void or voidable because his trial counsel failed to reasonably investigate and present compelling evidence that was vital mitigation after Petitioner testified poorly during his trial and was convicted of aggravated murder. Therefore, Petitioner's rights were denied under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 2, 5, 9, 10, 16, and 20 of Article I of the Ohio Constitution.

**Ground for Relief No. 7**

Petitioner's judgment and sentence are void or voidable because a juror failed to follow this court's instruction regarding the weighing process necessary to determine Petitioner's death sentence. As a result, Petitioner was denied his right to due process, and a fair trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.

**Ground for Relief No. 8**

Petitioner's conviction and sentence are void or voidable because his trial counsel failed to present compelling evidence about his third wife during the penalty phase of his capital trial. As a result, Petitioner was denied his right to effective assistance of counsel, due process, and a fair trial as guaranteed by the Fifth,

Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.

**Ground for Relief No. 9**

Petitioner's conviction and sentence are void or voidable because the death penalty as administered by lethal injection in the state of Ohio violates his constitutional rights to protection from cruel and [un]usual punishment and to due process of law. U.S. Const. amends. VIII, IX, XIV; Sections 1, 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution; *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998) (five justices holding that . . . the Due Process Clause protects the "life" interest at issue in capital cases).

**Ground for Relief No. 10**

Petitioner's judgment and sentence are void or voidable because, assuming *arguendo* that none of the grounds for relief in his post-conviction petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions presented in the petition's foregoing paragraphs have been prejudicial and have denied Petitioner his rights secured by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**Ground for Relief No. 11**

Petitioner's conviction and sentence are void or voidable because he was denied the effective assistance of counsel when trial counsel failed to act upon and utilize Petitioner's timely report of an escape attempt at the Delaware County Jail. The failure to act by defense counsel violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**Ground for Relief No. 12**

Petitioner's convictions and sentence are void or voidable because the State withheld material evidence—investigation in 2001 by the Columbus Police Department of the murders of Petitioner's first two wives—in violation of his rights to due process and a fair trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 1, 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.

On May 27, 2005, the state trial court dismissed Hand's petition for post-conviction relief, holding that his ninth and tenth grounds for relief failed on the merits, his seventh ground for

relief was based on evidence that violated Ohio evidence rules, and his remaining claims should have been raised on direct appeal and were therefore precluded by *res judicata*.

On June 23, 2005, Hand appealed the state trial court's dismissal of his petition for post-conviction relief, raising the following three assignments of error:

### Assignment of Error No. 1

The trial court erred by dismissing appellant's post-conviction petition where he presented sufficient operative facts and supporting exhibits to merit an evidentiary hearing and discovery.

### Assignment of Error No. II

Ohio's post-conviction procedures neither afford an adequate corrective process nor comply with due process and equal protection under the Fourteenth Amendment.

### Assignment of Error No. III

Considered together, the cumulative errors set forth in Appellant's substantive grounds for relief merit reversal or remand for a proper post-conviction process.

The Ohio Court of Appeals affirmed the trial court's decision on April 21, 2006. *State v. Hand*, No. 05CAA060040, 2006 WL 1063758 (Ohio Ct. App.). Of relevance to this appeal, the court held that Hand was not entitled to an evidentiary hearing because the trial court correctly determined that Hand's first, second, third, fourth, fifth, sixth, eighth, eleventh, and twelfth claims were precluded by *res judicata* because he failed to raise them properly on direct review. *Id.* at *3. The court also held that, even if not precluded, Hand's ineffective-assistance-of-counsel claims based on his counsel's performance during sentencing—claims four, five, six, eight, and eleven—were all meritless. *Id.* at *5.

Hand filed a notice of appeal to the Supreme Court of Ohio on June 5, 2006, raising four propositions of law, but the court declined review. *State v. Hand*, 852 N.E.2d 1215 (Ohio 2006) (unpublished table decision). Hand then filed a petition for certiorari to the United States Supreme Court, which was also denied. *Hand v. Ohio*, 549 U.S. 1217 (2007). This ended Hand's unsuccessful attempt to obtain state post-conviction relief.

D

Hand then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in federal district court on August 22, 2007.  He raised fifteen claims for relief, several of which contained additional sub-claims.  The district court granted Hand an evidentiary hearing, which was held in February 2010.  After the magistrate judge entered a report and recommendation and a supplemental report recommending that the district court deny Hand's petition—both swiftly followed by Hand's strenuous objections—the district court adopted the magistrate judge's report and denied Hand's petition in its entirety.  *Hand v. Houk*, No. 2:07-cv-846, 2013 WL 2372180 (S.D. Ohio May 29, 2013).

The district court granted Hand a Certificate of Appealability (COA) on six of those claims and associated sub-claims, and we expanded the COA to include an additional ineffective-assistance-of-appellate-counsel claim with three sub-claims.  Hand's claims and sub-claims for habeas relief are:

**Claim I**

Whether trial counsel's failure to further question jurors regarding pretrial publicity constituted ineffective assistance of counsel?

**Claim II**

Whether *res judicata* bars Hand's claim that the trial court conducted an inadequate voir dire into pretrial publicity?

**Claim III**

Whether appellate counsel's failure to (i) challenge the sufficiency of the evidence as to the aggravating circumstances and specifications of count two, specifications two through six; (ii) amend the brief to include juror bias issues; and/or (iii) allege that the trial court's inquiry into potential juror bias resulting from extensive pretrial publicity was constitutionally defective constituted ineffective assistance of counsel?

**Claim IV**

Whether trial counsel's failure at sentencing to (i) present expert psychological testimony; (ii) properly investigate, prepare and present mitigation evidence; and/or (iii) object to the reintroduction of all guilt-phase evidence constituted ineffective assistance of counsel?

**Claim V**

Whether the trial court failed to give the appropriate narrowing construction to the course of conduct specification?

**Claim VI**

Whether Hand fairly presented his federal constitutional 404B prior bad acts claim in state court?

**Claim VII**

Whether the jury convicted Hand of escape based on insufficient evidence?

Appellant's Br. at 1–2.

For the purpose of clarity, we will group some of Hand's claims together when analyzing them because they involve similar underlying issues. We will also address them in an order different from that in which he presents them.

II

We review a district court's habeas corpus decisions under a mixed standard of review, "examin[ing] the district court's legal conclusions *de novo* and its factual findings under a 'clearly erroneous' standard." *Kelly v. Lazaroff*, 846 F.3d 819, 827 (6th Cir. 2017) (alteration in original) (citations omitted).

Because Hand's habeas petition was filed after 1996, it is subject to the Antiterrorism and Effective Death Penalty Act (AEDPA). *See* 28 U.S.C. § 2254. AEDPA commands that, with exceptions not relevant here, "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b). AEDPA's exhaustion requirement gives "state courts the first opportunity to correct alleged violations of their prisoner's rights," *King v. Berghuis*, 744 F.3d 961, 964 (6th Cir. 2014) (citation omitted), and is satisfied when "the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims," *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). Because the exhaustion requirement "refers only to remedies still available at the time of the federal petition," *Gray v. Netherland*, 518 U.S. 152, 161 (1996) (citation omitted), a petitioner whose claims are

barred by *res judicata*, and are thus procedurally defaulted, has satisfied AEDPA's exhaustion requirement. "However, the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Kelly*, 846 F.3d at 828 (quoting *Gray*, 518 U.S. at 162).

> Determining whether a claim has been procedurally defaulted is a four-step inquiry:
>
> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that petitioner failed to comply with the rule . . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . . Third, the court must decide whether the state procedural ground is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim . . . . Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Ibid.* (quoting *Stone v. Moore*, 644 F.3d 342, 346 (6th Cir. 2011)). To inform this inquiry, "we look to the 'last explained state court judgment,' to determine whether relief is barred on procedural grounds." *Stone*, 644 F.3d at 346 (quoting *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004)).

When the state court has evaluated the petitioner's claim on the merits, AEDPA requires federal courts sitting in habeas review to grant the state court's decisions great deference. We are instructed not to grant habeas relief unless the state court's adjudication of the claim either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

This is no easy task for the habeas petitioner. In determining what constitutes "clearly established" federal law, we are limited strictly to the holdings of the Supreme Court, excluding any dicta. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (citations omitted). Moreover, in order to grant habeas relief on this ground, a state petitioner must show that the state court's

ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 562 U.S. 86, 103 (2011). "[E]ven clear error will not suffice" to grant habeas relief. *Moritz v. Woods*, No. 16-1504, 2017 WL 2241814, at *4 (6th Cir. May 22, 2017) (citation omitted). Similarly, a state court's findings of fact are unreasonable only where they are "rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). In addition, our review is limited to the record that was before the state court that adjudicated the claim on the merits in the first instance. *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

Only when the petitioner's claim was not procedurally defaulted (or if the procedural default was excused) *and* the state court never evaluated the claim on the merits do we analyze the petitioner's claim under the pre-AEDPA standard of review, which asks us to evaluate questions of law *de novo* and questions of fact for clear error. *See Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011); *Brown v. Smith*, 551 F.3d 424, 428, 430 (6th Cir. 2008).

III

Hand raises several claims involving the adequacy of the voir dire at his trial to screen jurors disqualified on the basis of pretrial publicity. In his second claim, he argues that Ohio's *res judicata* rules do not bar him from challenging the adequacy of the trial court's voir dire on habeas review. In his first claim, he argues that his trial counsel's failure to further question prospective jurors regarding pretrial publicity constituted ineffective assistance of counsel. In sub-parts (ii) and (iii) of his third claim, he argues that his appellate counsel on direct appeal was constitutionally ineffective for failing to amend his brief to include juror-bias issues or to challenge the trial court's inquiry into potential juror bias. We will analyze the voir dire claims in this order.

A

Hand's second claim is that the trial court's voir dire did not adequately screen jurors for bias due to extensive pre-trial publicity, thereby violating his constitutional right to a fair trial.

The district court held that this claim was procedurally defaulted because the Ohio courts determined that it was barred by *res judicata*. The district court was correct.

As this court has previously discussed, Ohio employs a bifurcated system of appellate review. *See McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013) ("Ohio law appears to contemplate two kinds of [appellate] claims, those based only on evidence in the trial record and those based in part on evidence outside the record."). For the first type of claim—those based only on evidence contained in the trial record—a convicted defendant is expected to raise the claim on direct appeal or else the claim is barred by the doctrine of *res judicata*. As the Ohio Supreme Court stated in the syllabus of *State v. Perry*, 226 N.E.2d 104 (Ohio 1967), and reiterated in *State v. Cole,* 443 N.E.2d 169 (Ohio 1982):

> Under the doctrine of *res judicata*, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was *raised or could have been raised by the defendant at the trial*, which resulted in that judgment or conviction, *or on an appeal* from that judgment.

*Cole*, 443 N.E.2d at 171. Only claims involving evidence outside the trial record may first be raised in a petition for state post-conviction relief. *See McGuire*, 738 F.3d at 751–52; *Cole*, 443 N.E. 2d at 171 ("Generally, the introduction in [a state post-conviction] petition of evidence *dehors* the record . . . is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of *res judicata*.").

It is undisputed that Hand first raised this claim in his state post-conviction proceeding, having failed to raise it previously on direct appeal. *See supra* Part I.B–C, pp. 7–14. The post-conviction trial court held, and the Ohio Court of Appeals affirmed, that the claim was barred by *res judicata* because claims of juror bias can be raised on direct appeal with evidence gathered from the trial record, such as the voir dire transcript. *Hand*, 2006 WL 1063758, at *4. We have previously held that an Ohio court's application of the *res judicata* doctrine is an adequate and independent state ground that bars federal habeas relief. *See Hanna v. Ishee*, 694 F.3d 596, 614 (6th Cir. 2012). The only question Hand raises on appeal is whether the Ohio courts correctly applied this procedural bar in light of the fact that he sought to introduce newspaper articles that

were outside of the record in support of his claim. Not only was this argument raised by Hand before the Ohio courts and rejected, *see Hand*, 2006 WL 1063758, at \*4 ("Appellant's attachment of exhibits demonstrating pre-trial publicity to the post-conviction relief petition, though admittedly outside the original trial record, merely supplements appellant's argument which was capable of review on direct appeal on the then extant record."), it finds no support elsewhere in Ohio case law. *See, e.g., State v. Franklin*, No. 19041, 2002 WL 1000415, at \*3 (Ohio Ct. App. May 17, 2002) ("Whether a trial court abused its discretion in unfairly limiting the scope of voir dire will ordinarily be ascertainable from the record.").

Because the Ohio courts correctly applied the doctrine of *res judicata* and because Hand did not argue cause and prejudice to excuse his default,[3] we hold that Hand procedurally defaulted his second claim for habeas relief.

B

Hand's first claim is that his trial counsel was constitutionally ineffective for failing to question two specific jurors regarding their exposure to pre-trial publicity. The district court held that this claim, like his second claim, was procedurally defaulted because the Ohio courts determined that it was barred by *res judicata*. Just as with his second claim, the district court was correct.

It is undisputed that Hand failed to raise this ineffective-assistance-of-trial-counsel claim on direct appeal, first raising this claim in his petition for state post-conviction relief.[4] Just as with his voir dire claim, *see supra* Part III.A, pp. 19–20, the post-conviction trial court held that this claim was barred by *res judicata*, and the Ohio Court of Appeals affirmed the trial court's judgment. *Hand*, 2006 WL 1063758, at \*4–5. Ohio's rules regarding its bifurcated appellate

---

[3]Although ineffective assistance of appellate counsel can excuse a procedural default, *see Murray v. Carrier*, 477 U.S. 478, 492 (1986), and Hand alleges in his habeas petition that his counsel on direct appeal was ineffective for failing to raise this very issue, he does so as part of a separate substantive claim for relief and not as cause to excuse this procedural default. In any event, Hand's claim of ineffective assistance of appellate counsel is meritless. *See infra* Part III.B–C, pp. 20–23.

[4]Although Hand did raise *an* ineffective-assistance-of-trial-counsel claim related to voir dire on direct appeal, he did not raise *this* one. Hand concedes that his direct-appeal claim "related to a different juror, supported by different allegations of bias, and did not assert ineffectiveness related to pretrial publicity." Appellant's Br. at 40 n.2.

system—requiring claims based upon evidence contained within the trial record to be brought on direct review—apply with equal force to ineffective-assistance-of-trial-counsel claims. Hand's claim, based on his trial counsel's performance during voir dire, could have been raised on direct appeal with the evidence contained within the trial record, just as he could have raised his analogous voir dire claim regarding the trial court. *Id.* at \*5 ("We find the [ineffective-assistance-of-trial-counsel] claims presented were cognizable and capable of review on direct appeal. . . . We note the record on direct appeal was supplemented with the jury questionnaires which appellant asserts merit review under post[-]conviction relief herein."). And as previously discussed, it is established law in this circuit that an Ohio court's application of the doctrine of *res judicata* is an independent and adequate state ground sufficient to bar habeas relief. *See Hanna*, 694 F.3d at 614.

However, Hand argues that the procedural default of his ineffective-assistance-of-trial-counsel claim, unlike his voir dire claim concerning the trial court's conduct, may be excused because his appellate counsel was constitutionally ineffective for not raising it. *See* Appellant's Br. at 39–44. Although Hand is correct that ineffective appellate counsel can excuse a petitioner's procedural default, *see Murray*, 477 U.S. at 492, his appellate counsel was not constitutionally ineffective. The constitutional standard for counsel is governed by *Strickland v. Washington*, 466 U.S. 668 (1984), which says that in order to succeed in an ineffective-assistance-of-counsel claim, a claimant must show that counsel acted "outside the wide range of professionally competent assistance" such that the claimant was prejudiced. *Id.* at 690. This is an extremely deferential standard, as "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Ibid.* Mere failure to raise a potentially viable claim is not enough, as "[a]ppellate counsel need not raise every non-frivolous claim on direct appeal." *Sanders v. Curtin*, 529 F. App'x 506, 521 (6th Cir. 2013). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

Hand's counsel on direct appeal raised thirteen claims for relief, including an array of state and federal constitutional claims. *See supra* Part I.B, pp. 7–11. The thrust of Hand's claim is that his appellate counsel should have also argued that his trial counsel was ineffective for failing to question certain prospective jurors about pretrial publicity, which turns on the substance of his underlying juror-bias-pretrial-publicity claim. But, as Supreme Court precedent makes clear, succeeding on a juror-bias challenge is no easy task. To demonstrate actual prejudice, the publicity and the voir dire testimony must show that "a fair trial was impossible," *White v. Mitchell*, 431 F.3d 517, 532 (6th Cir. 2005) (citation omitted). A mere preconceived notion as to the guilt or innocence of the accused is not enough to rebut the presumption of a prospective juror's impartiality. *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961). Moreover, a reviewing court is instructed to give the trial court's assessment of a juror's impartiality deference because of the unique ability of the trial judge to assess "the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling v. United States*, 561 U.S. 358, 386 (2010). Although both of the jurors that Hand argues were influenced by pretrial publicity indicated that they held preconceived notions about his case, both also made clear during voir dire that they could set aside any opinions that they might have held and decide the case on the evidence presented in court. Given the number and strength of the other claims Hand raised on direct appeal, the voir dire claim that Hand now alleges his counsel improperly omitted was not so strong that his counsel acted "outside the wide range of professionally competent assistance" by failing to raise it.

Because Hand has not demonstrated that his appellate counsel was ineffective for failing to raise his first claim on direct appeal in state court, the claim is not only procedurally defaulted, but Hand has also not shown sufficient cause and prejudice to excuse the default.

C

In sub-parts (ii) and (iii) of his third claim, Hand raises independent ineffective-assistance-of-appellate-counsel claims regarding his voir dire, alleging that his counsel on direct appeal was constitutionally ineffective for (ii) failing to amend his brief to include juror-bias issues and (iii) failing to allege that the trial court's inquiry into potential juror bias resulting

from pretrial publicity was defective.  The district court concluded that neither claim was defaulted, but both lacked merit.

The district court was correct for the same reason that Hand cannot excuse the procedural default of his previous claim: Hand has not demonstrated that his appellate counsel's conduct fell "outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  Strategic decisions of counsel, including whether to raise some non-frivolous claims over others, fall well within the range of professional competence.  In fact, "the process of 'winnowing out weaker arguments on appeal' is 'the hallmark of effective appellate advocacy.'"  *Monzo*, 281 F.3d at 579 (quoting *Smith v. Murray*, 477 U.S. 527, 536 (1986)).  As discussed above, *see supra* Part III.B, pp. 20–22, Hand's voir dire challenges were not "clearly stronger" than the 13 claims Hand's counsel did raise on direct appeal.  *Monzo*, 281 F.3d at 579.  For this reason, we hold that sub-parts (ii) and (iii) of Hand's third claim for habeas relief are meritless.  This resolves Hand's voir dire claims.

IV

In his fourth claim, Hand raises a trio of ineffective-assistance-of-trial-counsel sub-claims based upon his trial counsel's performance during sentencing.  He argues that his counsel was constitutionally ineffective for failing to (i) present expert psychological testimony, (ii) properly investigate, prepare, and present mitigation evidence, and (iii) object to the reintroduction of all guilt-phase evidence.  The district court concluded that the first sub-claim was procedurally defaulted or, alternatively, failed on the merits and that the remaining sub-claims could not overcome AEDPA deference.  The district court was correct.

A

In his first sub-claim, Hand argues that his trial counsel was constitutionally ineffective for failing to present expert psychological testimony during the sentencing phase.  The thrust of Hand's argument is that his trial counsel failed to take full advantage of the services of Dr. Daniel Davis, a forensic psychologist who testified on Hand's behalf during sentencing.  Appellant's Br. at 56, 62–70.  In advance of testifying, Dr. Davis administered to Hand a number of psychological tests, including the Minnesota Multiphasic Personality Inventory ("MMPI").

The MMPI is a psychological test that assesses a patient's personality traits and psychopathology and is primarily used to test those who are suspected of having mental-health issues. Hand's test did not indicate that he suffered from an antisocial personality disorder as previously thought, but rather that he struggled with internalizing his feelings. Based on these results, Dr. Davis diagnosed Hand with hypochondria, depression, and anxiety. *Id.* at 68. Although Dr. Davis testified on Hand's behalf during sentencing, trial counsel never asked Dr. Davis questions about Hand's MMPI results, instead focusing Dr. Davis's testimony on Hand's ability to adjust to prison life if he were sentenced to life in prison without parole.[5] *Ibid.* Hand now argues that, had Dr. Davis testified as to his mental-health afflictions, the jury would likely have been swayed to spare his life.

Although Hand raised arguments on direct appeal that his trial counsel was constitutionally ineffective during sentencing, *see supra* Part I.B, pp. 7–11, he did not raise this particular argument until he filed his petition for post-conviction relief in state court, *see supra* Part I.C, pp. 11–14. As previously discussed, Ohio requires convicted defendants presenting claims based on evidence contained in the record to advance those claims on direct appeal or risk forfeiting them under principles of *res judicata*. *Cole*, 443 N.E.2d at 171. The state post-conviction court denied Hand's claim for relief on this ground, noting that this was a claim that should have been raised on direct appeal. *Hand*, 2006 WL 1063758 at *5. This is an independent and adequate state ground sufficient to bar habeas relief. *See Hanna*, 694 F.3d at 614.

Hand raises two arguments on appeal for why we should evaluate this claim on the merits: (1) his claim depends on evidence outside of the trial record and, thus, is not barred by Ohio's *res judicata* rules, and (2) his constitutionally ineffective counsel on direct appeal can excuse any procedural default. Neither argument has merit. As the district court noted, Ohio's *res judicata* rules are designed to prevent a convicted defendant from raising claims that could have been raised on direct appeal in subsequent claims for relief. *Hand*, 2013 WL 2372180, at *45. Claims based on extra-record evidence are not barred by *res judicata* on the premise that a

---

[5]Specifically, Dr. Davis testified that Hand had positive qualities that would enable him to contribute to society while imprisoned, including his intelligence, vocational skills, and his absence of past drug abuse.

convicted defendant cannot be expected to raise a claim based on such evidence within the filing period for direct appeal. It is undisputed that the allegedly unavailable outside-of-the-record evidence Hand points to in support of his claim—namely, his MMPI results and the information contained within Dr. Davis's post-conviction affidavit—were available to Hand *during trial* and easily accessible to his appellate counsel. Ohio's *res judicata* rules were therefore correctly applied in this case.

Although Hand is correct to suggest that ineffective assistance of appellate counsel can excuse a procedural default, *see Murray*, 477 U.S. at 492, Hand's appellate counsel did not fall "outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, for many of the same reasons discussed above. *See supra* Part III.B, pp. 20–22. Here, the claim that Hand contends his appellate counsel should have raised on direct appeal is that his trial counsel was constitutionally ineffective for failing to introduce specific psychological evidence at sentencing. Hand points to only two cases—*Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995), and *Williams v. Taylor*, 529 U.S. 362 (2000)—to support the proposition that the failure to present mitigating evidence at sentencing constitutes ineffective assistance of counsel, and neither case applies to the facts before us. In *Glenn*, a pre-AEDPA habeas case, we held that trial counsel was constitutionally ineffective where "the lawyers made virtually no attempt to prepare for the sentencing phase of the trial until after the jury returned its verdict of guilty" and "[o]nly one of Glenn's lawyers did any preparatory work at all following the verdict." 71 F.3d at 1207. In *Williams*, trial counsel similarly "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." 529 U.S. at 395. Hand's trial counsel, by comparison, investigated Hand's psychological background and made the strategic decision to emphasize his ability to adjust to life in prison and mentor other inmates. In light of the relevant case law, it cannot be said that Hand's ineffective-assistance-of-trial-counsel claim was "clearly stronger" than the thirteen claims that Hand's counsel presented on direct appeal such that his appellate counsel violated constitutional standards of representation by failing to raise it. Therefore, this first sub-claim was procedurally defaulted.

B

In his second sub-claim, Hand argues that his trial counsel was constitutionally ineffective for failing to properly investigate, prepare, and present mitigation evidence at sentencing. Unlike his first sub-claim, Hand properly presented this ineffective-assistance-of-trial-counsel claim on direct appeal. The Ohio Supreme Court denied the claim on the merits, and we are therefore required to give its adjudication of this issue deference under AEDPA. *See* *supra* Part II, pp. 16–18. In addition, because the underlying claim is an ineffective-assistance-of-counsel claim, we are also required to defer to the reasoned decisions of Hand's trial counsel. *See Strickland*, 466 U.S. at 690 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."). In practice, this amounts to a "doubly deferential standard of review that gives both the state court *and* the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (citation omitted) (emphasis added). "Stated differently, AEDPA requires us to 'take a highly deferential look at counsel's performance through the deferential lens of § 2254(d).'" *Kelly*, 846 F.3d at 832 (quoting *Pinholster*, 563 U.S. at 190).

Hand cannot overcome this deferential standard of review. He argues that his trial counsel's mitigation strategy was constitutionally defective for several reasons: (1) failing to present his mother and sister as witnesses; (2) failing to present any witnesses or testimony about his military service or performance in school; (3) relying heavily on Hand's unsworn statement to the jury; and (4) failing to present a closing argument to the jury. Appellant's Br. at 57–62. The Ohio Supreme Court held that these decisions fell within the category of "tactical decisions" of trial counsel that are "virtually unchallengeable" on review. *Hand*, 840 N.E.2d at 188–92. The record reflects that Hand's trial counsel employed a mitigation specialist, an investigator, and a psychologist during sentencing. *Id.* at 188. The record also reflects that Hand's trial counsel presented several witnesses, including the psychologist, a former acquaintance of Hand's, and Hand's son, in a coherent trial strategy aimed at convincing the jury that Hand would be an asset and a role-model prisoner in Ohio's prison system. Appellant's Br. at 56, 61. Based on this evidence, trial counsel's performance did not fall below constitutional standards during sentencing, and much less did the Ohio Supreme Court adjudicate the issue so

inadequately as to merit reversal under AEDPA.  Therefore, this second sub-claim also fails on the merits.

C

In his third sub-claim, Hand argues that his trial counsel was constitutionally ineffective for failing to object to the reintroduction of all guilt-phase evidence during sentencing.  Like his second sub-claim, Hand raised this claim on direct review, and the Ohio Supreme Court denied the claim on the merits.  *Hand*, 840 N.E.2d at 190–91.  Because this is an ineffective-assistance-of-counsel claim and because the state court adjudicated the claim on the merits, this claim is also due the "doubly deferential" standard of review that we gave to his second sub-claim.  *See supra* Part IV.B, pp. 26–27.

Although this is a somewhat closer question, Hand cannot overcome this deferential standard of review.  The thrust of his argument is that his trial counsel failed to object to the introduction of a number of graphic trial exhibits at sentencing, including photos and autopsy reports of his deceased wives and Walter Welch.  Appellant's Br. at 70–73.  The Ohio Supreme Court held that Hand's trial counsel was not ineffective for failing to object because (1) Ohio's evidence rules permit the reintroduction of guilt-phase exhibits at sentencing and (2) Hand did not specify which exhibits he believed prejudiced him.  *Hand*, 840 N.E.2d at 190–91 (citing R.C. 2929.03(D)(1)).  As the district court noted below, however, Ohio evidence law does not relieve the trial court of its duty to determine the relevance of any evidence when the admission of that evidence is challenged at sentencing.  *See State v. Gumm*, 653 N.E.2d 253, 263 (Ohio 1995) (listing five general categories of potentially relevant guilt-phase evidence, including "(1) any evidence raised at trial that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty, (2) any other testimony or evidence relevant to the nature and circumstances of the aggravating circumstances specified in the indictment of which the defendant was found guilty, (3) evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant, (4) the presentence investigation report, where one is requested by the defendant, and (5) the mental examination report, where one is requested by the defendant").

The Ohio Supreme Court never ruled on each individual piece of guilt-phase evidence that Hand's trial counsel permitted to be introduced at sentencing. Even if we were to hold, however, that the Ohio Supreme Court applied the wrong evidentiary law in analyzing Hand's ineffective-assistance-of-trial-counsel claim, it is not entirely clear that Hand either properly exhausted this precise claim before the Ohio courts or suffered prejudice from his trial counsel's alleged error. Although Hand now specifies in his habeas petition the specific evidentiary exhibits that he claims prejudiced him during sentencing, he failed to specify a single exhibit in his direct appeal before the Ohio Supreme Court. *Hand*, 840 N.E.2d at 190. It follows that this precise variation of his claim was never properly presented to the Ohio courts and exhausted, as Hand did not specify the exhibits that prejudiced him on direct appeal and failed to raise his more precise claim in any subsequent petition for relief. Because Hand does not raise an argument for why this procedural default should be excused, the claim is procedurally defaulted.[6] Even if we were to evaluate Hand's more specific claim on the merits, it is not at all clear that Hand was prejudiced by his trial counsel's failure to object to the introduction of guilt-phase evidence. The graphic photos and autopsy reports were relevant to the death-penalty specifications that Hand's murders included the use of a firearm and were committed during a course of conduct while attempting to kill two or more people. *See Gumm*, 653 N.E.2d at 263. In any event, the jury had already seen the exhibits during the guilt phase of the trial. We cannot conclude, based on this evidence, that Hand was prejudiced by his trial counsel's alleged error in failing to object to the introduction of all guilt-phase evidence during sentencing.

This resolves Hand's ineffective-assistance-of-trial-counsel claims based upon his counsel's performance during sentencing.

V

In the first sub-part of his third claim, Hand argues that his counsel on direct appeal was constitutionally ineffective for failing to challenge the sufficiency of the evidence as to certain aggravating circumstances and death-penalty specifications. In particular, Hand argues that his

---

[6]Were we to hold otherwise, a criminal defendant could raise a vague generic version of a claim before a state court only to raise a more specific claim in a federal habeas petition, effectively bypassing the deference to state courts commanded by AEDPA.

appellate attorneys should have challenged the sufficiency of the evidence supporting the death-penalty specification that Hand killed Welch in order to prevent him from revealing Hand's involvement in his wives' murders. Appellant's Br. at 50–53. The district court held that the claim was not procedurally defaulted but nonetheless failed on the merits. The district court was correct.

It is undisputed that Hand first raised this claim in his April 18, 2006 application to reopen his direct appeal. *See supra* Part I.B, pp. 7–11. Under Ohio law, a convicted defendant may file an application to reopen his direct appeal and introduce new claims on the ground that his initial appellate counsel was constitutionally ineffective, and we have previously treated such applications as ineffective-assistance-of-counsel claims. *See Kelly*, 846 F.3d at 831 (treating an application filed pursuant to Ohio Rule of Appellate Procedure 26(B)[7] as an ineffective-assistance-of-appellate-counsel claim). The Ohio Supreme Court denied the application summarily. *Hand*, 852 N.E.2d at 185.

Hand argues that, because the Ohio Supreme Court denied his application without comment, he is entitled to *de novo* review. Appellant's Br. at 50–51. That is incorrect. The Supreme Court has instructed us to presume that when a federal claim has been presented to a state court and the state court denies relief, "the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This is true even where, as is the case here, the state court does not offer an explanation for its decision. *Ibid.* Stated in AEDPA's terms, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Id.* at 98. If "there is reason to think some other explanation for the state court's decision is more likely," we permit a habeas petitioner to rebut the presumption that the state court's decision was on the merits. *Id.* at 99–100. But Hand offers no reason to rebut the presumption in this case, and thus

---

[7]Although Hand filed his application pursuant to Ohio Supreme Court Practice Rule XI, the two rules are substantively identical. Rule XI was promulgated to give criminal defendants who have been sentenced to death, and who therefore appeal their conviction and sentence directly to the Ohio Supreme Court, the same opportunity to reopen their direct appeal as criminal defendants who must first appeal their case to Ohio's intermediate appellate courts.

AEDPA deference applies. We may therefore grant relief only if the state court decision was unreasonable.**[8]**

Moreover, because Hand's claim is an ineffective-assistance-of-counsel claim, which itself demands deference to the strategic decisions of counsel, we must evaluate Hand's claim under a "doubly deferential" standard of review. *Burt*, 134 S. Ct. at 13. To establish ineffective assistance of appellate counsel, a petitioner must show that his appellate counsel's failure to raise a claim was objectively unreasonable and that he was prejudiced as a result. *Strickland*, 466 U.S. at 690. A petitioner can demonstrate that his appellate counsel's performance was objectively unreasonable where the unraised claim was "clearly stronger" than those presented. *Monzo*, 281 F.3d at 579. Here, the underlying unraised claim is a sufficiency-of-the-evidence challenge to the specification that Hand murdered Welch in order to cover up his previous wives' murders. To have succeeded on this claim, Hand's counsel would have had to prove that, after reviewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the contested death-penalty specifications beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). At trial, several witnesses testified regarding statements Welch made about killing Hand's previous wives for money, and one jailhouse informant testified that Hand killed Welch because their deal to kill Jill went sour over money. *Hand*, 840 N.E.2d at 162, 168. Based on this evidence and the standard of review, we cannot hold that Hand's appellate counsel acted unreasonably by failing to raise this sufficiency-of-the-evidence challenge on direct review, much less that counsel's failure to do so was so obvious that the Ohio Supreme Court's denial of Hand's ineffective-assistance-of-counsel claim was unreasonable under AEDPA. We therefore deny the claim.

## VI

In his fifth claim, Hand argues that the trial court failed to give the appropriate narrowing construction to the course-of-conduct specification for the death penalty, in violation of his rights

---

**[8]**Hand argues that our decision in *McKenzie v. Smith*, 326 F.3d 721 (6th Cir. 2003), permits us to hear his claim *de novo*. Not only does this decision predate *Harrington*, it is distinguishable on its facts. In that case, there was evidence suggesting that the Michigan state trial court wrongly "believed that the [state] court of appeals had already considered the claim." *Id.* at 727. There is no such evidence in this case.

under the Eighth and Fourteenth Amendments.  The district court held that the claim was procedurally defaulted because Hand had failed to object to the jury instructions at trial and the Ohio Supreme Court had enforced its contemporaneous-objection rule.  The district court went on to conclude that, even if the claim were not procedurally defaulted, it still failed on the merits.  The district court was correct—Hand's claim was procedurally defaulted.

Hand first raised his course-of-conduct claim on direct appeal.  His argument focused on the death-penalty specifications associated with the aggravated murders of Jill and Welch, which required the jury to determine that each murder "was part of a course of conduct involving the purposeful killing of two or more persons by the defendant."  *Hand*, 840 N.E.2d at 183.  The crux of Hand's argument is that the trial court's course-of-conduct instructions were insufficiently clear because they permitted the jury to infer guilt from Hand's involvement in his previous wives' deaths—i.e., that the jury could conclude that the "two or more persons" element of the death-penalty specification was satisfied by the deaths of Donna and Lori. Problematically, however, Hand failed to object to the trial court's course-of-conduct instruction during trial.  Under Ohio law, this means Hand "waived all but plain error" review.  *Ibid.*  The Ohio Supreme Court concluded that under this standard of review, Hand's claim was meritless. *Id.* at 183–84.

We have previously held that an Ohio court's enforcement of the contemporaneous-objection rule is "'an independent and adequate state ground' of decision" sufficient to bar habeas relief.  *Wogenstahl v. Mitchell*, 668 F.3d 307, 336 (6th Cir. 2012) (citation omitted).  The mere fact that the Ohio Supreme Court conducted "plain error review does not constitute a waiver of the state's procedural default rules and resurrect the issue." *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).  Therefore, Hand is barred from raising this claim for relief in a habeas petition unless he can demonstrate cause and prejudice to excuse the default.

Hand argues that this default can be excused because his "appellate counsel's failure to raise the present claim on direct appeal fell below an objectively reasonable standard, causing [the] default and resulting in prejudice."  Appellant's Br. at 79.  But Hand misunderstands the state procedural posture of his case.  His *appellate* counsel's error is not what caused him to default this claim.  Rather, his *trial* counsel's failure to object to the trial court's instruction is

what caused his claim to be procedurally defaulted. Even if we were to construe Hand's brief to allege ineffective assistance of trial counsel—or even ineffective assistance of appellate counsel for failing to raise an ineffective-assistance-of-trial-counsel claim—his argument for cause and prejudice would itself be procedurally defaulted. *See Edwards v. Carpenter*, 529 U.S. 446, 451–52 (2000) ("[I]neffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim . . . . *[T]hat* constitutional claim, like others, [must] be first raised in state court."). Even though Hand had ample opportunity to raise either ineffective-assistance claim before the Ohio courts on appeal, he failed to do so. Therefore, any argument that Hand's procedurally defaulted course-of-conduct claim could be excused is itself defaulted, and we deny the claim.

VII

In his sixth claim, Hand argues that the state trial court improperly admitted five instances of prior-bad-acts evidence, thereby violating his rights secured by the Fifth, Seventh, Eighth, and Fourteenth Amendments. The district court held that although Hand invoked constitutional provisions in support of his claim, his argument was grounded on Ohio evidence law. Because he did not "fairly present" his federal constitutional claim to the Ohio courts, the claim was procedurally defaulted. In the alternative, the district court held that four of his five prior-bad-acts claims were procedurally defaulted because he failed to object at trial and that his fifth claim was meritless. The district court was correct on both counts—Hand did not fairly present his constitutional claims to the Ohio courts, and, in any event, the claims are either procedurally defaulted or meritless.

Hand's prior-bad-acts claim on direct appeal pointed to five instances where he alleges evidence was improperly admitted: (1) the prosecutor argued during closing argument that Hand's failure to pay taxes demonstrated disrespect for the law and a willingness to lie and deceive; (2) witnesses testified about Hand's reaction to the deaths of his first two wives, Donna and Lori; (3) a witness testified that Hand once told him "he was a horny old man" but Lori didn't want sex as often as he did, and another witness testified that Hand was infatuated with a friend's daughter; (4) a childhood friend of Hand testified that he liked to read "true crime" stories; and (5) the prosecution introduced evidence that he forced his father out of business and

was obsessed with money. *Hand*, 840 N.E.2d at 176–79. Because Hand failed to object at trial to each allegedly improper instance except instance (2), the Ohio Supreme Court reviewed four of the five instances for plain error. The court ultimately denied each instance of Hand's claim under Ohio evidence law. *Ibid.*

Hand argues that this was sufficient to present the substance of his federal claim to the Ohio courts, as every prospective habeas petitioner is required to do under federal law. *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004) ("To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . . thereby alerting that court to the federal nature of the claim." (citations omitted)). To determine whether a petitioner has fairly presented a claim in state court, we ask whether the petitioner: (1) relied upon federal cases employing constitutional analysis; (2) relied upon state cases employing federal constitutional analysis; (3) phrased the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well within the mainstream of constitutional law. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). "While a petitioner need not cite 'chapter and verse' of constitutional law, 'general allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present claims" that specific constitutional rights were violated.'" *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (quoting *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004)).

In his brief on direct appeal to the Ohio Supreme Court, Hand broadly alleged that the introduction of these instances of prior-bad-acts evidence violated "his rights to a fair trial, due process and a reliable determination of his guilt and sentence" as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the Constitution. In support of this claim, however, Hand almost exclusively cited Ohio cases that address Ohio evidence law. At no point did he connect the trial court's alleged misapplication of state evidence law to rights secured to him by the United States Constitution. In fact, the only federal case that Hand cited in this entire section of his state appellate brief was *Chapman v. California*, 386 U.S. 18 (1967), and only for the limited purpose of defining "harmless error." Even if we were to construe Hand as having cited *Chapman* generally in support of his claim, it would do him no good. *Chapman* dealt with a defendant's Fifth Amendment right to silence, which has nothing to do with the prior-bad-acts

claims that Hand raised before the state court. Based on the foregoing, Hand did not fairly present his federal constitutional claims to the state court on direct appeal, and those claims are therefore procedurally defaulted. Because Hand does not allege cause and prejudice to excuse the default, this concludes the analysis of his sixth claim of relief.[9]

## VIII

In his seventh, and final, claim for habeas relief, Hand argues that the prosecution presented insufficient evidence to prove each of the elements of escape under Ohio law. The district court held that the Ohio Supreme Court applied the correct standard of review and concluded that there was sufficient evidence for a rational juror to find Hand guilty of escape beyond a reasonable doubt. The district court was correct.

Hand first raised this claim on direct appeal. *See supra* Part I.B, pp. 7–11. He argued that there was no evidence that he was involved in planning the escape attempt or that he directly assisted in cutting the emergency door lock. *Hand*, 840 N.E.2d at 181. He also argued that the testimony that he was acting as a lookout, even if true, was insufficient to convict him of the crime. The Ohio Supreme Court disagreed. The court began by explaining the standard of review: "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* at 180–81 (alteration in original) (citation omitted). Pointing to the record, the court noted the wealth of witness testimony that implicated him in the escape attempt, including testimony that linked him to planning the escape. *Id.* at 181. The court also referred to the circumstantial evidence that supported Hand's guilt, including "some torn-up teeshirt material and a pencil with a piece of teeshirt tied around it" that was found in Hand's cell—items that were "consistent to what was tied to the saw blades and . . . to what inmates do to hide things." *Ibid.* Even if the evidence established only that Hand was acting as a lookout, the court concluded, there was sufficient evidence for a rational juror to find that Hand

---

[9]Even if Hand did argue that ineffective assistance of appellate counsel might excuse this default, he procedurally defaulted that claim by failing to raise his prior-bad-acts claim in either of his applications to reopen his direct appeal. *See Edwards*, 529 U.S. at 452–53.

was an accomplice in the escape attempt, who Ohio law commands "shall be prosecuted and punished as if he were a principal offender." *Ibid.* (quoting Ohio Rev. Code Ann. § 2923.03(F)).

As the Ohio Supreme Court addressed this claim on the merits, we are required to grant that decision AEDPA deference on review. *See supra* Part II, pp. 16–18. AEDPA only permits us to grant habeas relief if the state court's adjudication of the petitioner's claim either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Because the Ohio Supreme Court did not misstate the law or unreasonably interpret the facts in the record of this case, we deny Hand's sufficiency-of-the-evidence claim.

IX

Based on the foregoing, the claims in Gerald Hand's habeas petition are all either procedurally defaulted or meritless. We therefore AFFIRM the decision of the district court.